62 A.3d 343

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Joseph ABRAHAM, Appellee.**

Supreme Court of Pennsylvania.

Argued April 13, 2011.

Decided Dec. 7, 2012.

294

Rebecca Good McBride, Michael Wayne Streily, Pittsburgh, Allegheny County District Attorney's Office, for Commonwealth of Pennsylvania.

Patrick Kennedy Cavanaugh, William Shaw Stickman IV, Pittsburgh, Del Sole Cavanaugh Stroyd, L.L.C., for Joseph Abraham.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Justice EAKIN.

The Commonwealth appeals from the order of the Superior Court reversing the order denying appellee's petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546, and remanding for an evidentiary hearing. We reverse.

Appellee, Joseph Abraham, was a high school teacher in the Pittsburgh public school system. In 2008, one of his students alleged he offered her $300 to have sex with him and touched her buttocks; she further stated he gave her one of his business cards and wrote his private cell phone number on it. After these allegations surfaced, appellee, who was 67 years old, retired from teaching and began receiving pension payments of $1,500 per month. Shortly after appellee retired, he was charged for the above incident. Pursuant to a negotiated agreement, appellee pled guilty to corruption of a minor[1] and indecent assault of a person less than 16 years of age.[2] He was sentenced to probation; no direct appeal was filed.

Because the crime of indecent assault of a person less than 16 years of age is one of the enumerated offenses in the Public Employee Pension Forfeiture Act (PEPFA), 43 P.S. §§ 1311–1315, appellee forfeited his pension when he pled guilty to this charge. He filed a motion to withdraw his plea *nunc pro tunc*, alleging he was not informed of his right to seek withdrawal of his plea or of the possible sentences he faced. The trial court denied the motion.

Appellee filed a timely PCRA petition alleging plea counsel was ineffective for failing to inform him he would forfeit his

1. 18 Pa.C.S. § 6301.

2. *Id.,* § 3126.

pension upon pleading guilty. The PCRA court, after giving the required notice pursuant to Pa.R.Crim.P. 907(1), dismissed the petition without a hearing. In its Pa.R.A.P.1925(a) opinion, the PCRA court stated the loss of appellee's pension was an issue collateral to the plea; thus, under *Commonwealth v. Frometa*, 520 Pa. 552, 555 A.2d 92, 93 (1989), plea counsel's failure to explain this consequence to appellee was not relevant to whether his plea was knowing and voluntary. Accordingly, the PCRA court held counsel was not ineffective.

On appeal, the Superior Court reversed, holding a recent United States Supreme Court decision, *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 1483, 176 L.Ed.2d 284 (2010), abrogated *Frometa*, which held deportation was collateral consequence of a guilty plea and therefore did not need to be explained to the defendant. The Superior Court noted *Padilla*, which also dealt with deportation following entry of a guilty plea, held such consequences were so intimately connected with the criminal process that a direct versus collateral consequences analysis [3] was ill suited to evaluate an ineffectiveness claim arising in this context. *Commonwealth v. Abraham*, 996 A.2d 1090, 1092 (Pa.Super.2010). Rather, the court observed, *Padilla* examined the totality of the circumstances to determine whether counsel's failure to advise his client he would be deported if he pled guilty to drug charges constituted ineffective assistance. *Id.* The Superior Court noted factors such as the certainty of the consequence, the connection between criminal activity and the consequence, and the consequence's being succinct, clear, and distinct played a role in the Supreme Court's analysis. *Id.*, at 1092–93. However, the court concluded it was unclear whether, under *Padilla*, the direct versus collateral consequences analysis was still viable, noting such "analysis might still be useful if the nature of the action is not as 'intimately connected' to the criminal process as deportation." *Id.*, at 1092.

**3.** This analysis has been traditionally employed by Pennsylvania courts in determining whether a consequence is civil or penal, and is discussed in more detail *infra*.

The court reasoned that determining whether a consequence is civil or penal—an analysis predominantly used to evaluate *ex post facto* challenges—was relevant to determining whether counsel was constitutionally effective in this case, as both situations implicate due process. *Id.*, at 1093. Accordingly, the court analyzed pension forfeiture under the two-prong test applied in *Lehman v. Pennsylvania State Police*, 576 Pa. 365, 839 A.2d 265 (2003),[4] and applied the seven "guideposts" *Lehman* used in assessing the effect of the measure at issue. The court concluded: (1) the legislature intended forfeiture of pension benefits under PEPFA to be a civil sanction; (2) pension forfeiture is an affirmative disability; (3) there does not appear to be a historical use of pension forfeiture as applied to criminal behavior; (4) no independent finding of *scienter* is required to trigger pension forfeiture; (5) the underlying behavior to which pension forfeiture applies is solely criminal; (6) pension forfeiture promotes the traditional aims of punishment, acting as both retribution and deterrence; and (7) there is no alternative purpose for pension forfeiture, and thus there is no need to determine whether the sanction appears excessive in relation to such purpose. *Abraham*, at 1093–94. Based on these guideposts, the court concluded, "[I]t is apparent the loss of pension is punitive in nature." *Id.*, at 1094. Applying *Padilla's* "newly minted" approach, *id.*, at 1093, the court concluded:

> Because of the automatic nature of forfeiture, the punitive nature of the consequence, and the fact that only criminal behavior triggers forfeiture, the application of PEPFA is, like deportation, intimately connected to the criminal process. Therefore, counsel was obliged to warn his client of the loss of pension as a consequence to pleading guilty.

*Id.*, at 1095.

The court alternatively concluded that if it applied the direct versus collateral consequences analysis, the result would be

4. The first prong addresses whether the intent of the measure is punitive or civil. If it is civil, the second prong inquires whether the measure is so punitive in purpose or effect as to negate the legislative intent to deem it civil. *Lehman*, at 271. This test was enunciated in *Smith v. Doe*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003).

the same: "loss of pension is related to the nature of the sentence and the application of the measure has a definite, immediate and automatic effect on the range of punishment." *Id.* (citing *Commonwealth v. Wall,* 867 A.2d 578, 582 (Pa.Super.2005)). Therefore, the court held plea counsel was obliged to inform appellee he would forfeit his pension if he pled guilty to the triggering crime.

The Superior Court thus concluded appellee met the "arguable merit" and "reasonable basis" prongs of the ineffectiveness test,[5] but held in the absence of a record, it could not conclude whether appellee suffered prejudice resulting from counsel's inaction; the only evidence was appellee's signed, notarized declaration that if counsel had advised him of the pension forfeiture, he would have either sought to plead guilty to a charge other than indecent assault or would have gone to trial. Accordingly, the Superior Court held an evidentiary hearing was necessary to determine the issue of prejudice, and reversed and remanded. Judge Bowes concurred in the result.

We granted the Commonwealth's Petition for Allowance of Appeal to determine:

(1) Whether, in light of *Padilla v. Kentucky,* 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), the distinction in Pennsylvania between direct and collateral consequences to define the scope of constitutionally "reasonable and professional assistance" required under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) is appropriate?

(2) If so, whether the forfeiture of a pension that stems from a public school teacher's negotiated plea to crimes committed in the scope of his employment is a collateral consequence of a criminal conviction which relieves

---

5. To establish counsel's ineffectiveness, a PCRA petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for the course of action chosen; and (3) counsel's action or inaction prejudiced the petitioner. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987).

counsel from any affirmative duty to investigate and advise?

*Commonwealth v. Abraham*, 607 Pa. 618, 9 A.3d 1133 (2010). Because these are questions of law, our scope of review is plenary, and our standard of review is *de novo*. *Commonwealth v. Colavita*, 606 Pa. 1, 993 A.2d 874, 886 (2010).

 We first address whether a direct versus collateral consequences analysis remains viable in light of *Padilla*.[6] Padilla, a native of Honduras, had been a lawful permanent resident of the United States for over 40 years when he was charged with transporting drugs, a deportable offense under 8 U.S.C. § 1227(a)(2)(B)(i). He pled guilty, not knowing he faced deportation. He later claimed his counsel did not advise him of this consequence prior to entry of the plea, assuring him he did not have to worry about deportation because he had been in the country for so long. Padilla contended he

---

**6.** We note the Superior Court recently acknowledged *Padilla* did not create a new constitutional right; rather, it "clarified and refined the scope of a criminal defendant's long-standing constitutional right to the effective assistance of counsel during the guilty plea process." *Commonwealth v. Garcia*, 23 A.3d 1059, 1064 (Pa.Super.2011) (footnote omitted). Likewise, the Third Circuit has held *Padilla* is retroactively applicable on collateral review because it did not announce a new rule of law. *See United States v. Orocio*, 645 F.3d 630, 641 (3d Cir. June 29, 2011). However, the Seventh and Tenth Circuits have held *Padilla* constitutes a new rule and is thus not to be applied retroactively. *See Chaidez v. United States*, 655 F.3d 684, 688–93 (7th Cir.2011), *cert. granted*, *Chaidez v. United States*, — U.S. ——, 132 S.Ct. 2101, 182 L.Ed.2d 867 (2012); *see also United States v. Chang Hong*, 671 F.3d 1147, 1158–59 (10th Cir.2011). The district courts that have addressed the issue are split. *See United States v. Diaz–Palmerin*, 2011 WL 1337326, 2011 U.S. Dist. LEXIS 37151 (N.D. Ill. filed April 5, 2011) (*Padilla* did not announce new rule); *Martin v. United States*, 2010 WL 3463949, 2010 U.S. Dist. LEXIS 87706 (C.D. Ill. filed Aug. 25, 2010) (same); *United States v. Chavarria*, 2011 WL 1336565, 2011 U.S. Dist. LEXIS 38203 (N.D. Ind. filed April 7, 2011) (same); *United States v. Laguna*, 2011 WL 1357538, 2011 U.S. Dist. LEXIS 38856 (N.D. Ill. filed April 11, 2011) (*Padilla* announced new rule); *United States v. Aceves*, 2011 WL 976706, 2011 U.S. Dist. LEXIS 27813 (D. Hawaii filed March 17, 2011) (collecting cases). The United States Supreme Court heard argument in *Chaidez* November 1, 2012, on the issue of *Padilla's* retroactivity.

We need not address *Padilla's* retroactivity, as this issue is not raised by the parties. Whether *Padilla* is applied or not, appellee is not entitled to relief, as discussed *infra*.

would have insisted on going to trial had counsel not given him incorrect advice.

The Supreme Court of Kentucky denied relief, holding deportation was a collateral consequence of Padilla's conviction, such that the Sixth Amendment's guarantee of effective assistance of counsel did not protect him from counsel's erroneous advice regarding deportation. *Commonwealth v. Padilla,* 253 S.W.3d 482, 485 (Ky.2008). In the Court's view, "collateral consequences are outside the scope of the guarantee of the Sixth Amendment right to counsel[.]" *Id.*

The United States Supreme Court reversed, concluding counsel had an obligation to advise Padilla the offense to which he would plead guilty was a deportable one, and that constitutionally competent counsel would have given such advice. *Padilla v. Kentucky,* 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). Accordingly, the Court concluded Padilla had established *Strickland's* first prong—constitutional deficiency. However, the Court declined to conclude Padilla established *Strickland's* second prong—prejudice—because this issue was not ruled upon below. The Court reversed and remanded for proceedings consistent with its decision. *See id.,* at 1483–84, 1487.

In holding counsel's failure to properly advise on deportation deprived Padilla of his Sixth Amendment right to effective counsel, the Court noted changes to immigration law over the past century "have dramatically raised the stakes of a noncitizen's criminal conviction. The importance of accurate legal advice for non-citizens accused of crimes has never been more important." *Id.,* at 1480. The Court observed the Kentucky Supreme Court was not alone in its view that deportation was a collateral consequence, but stated, "We, however, have never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland.* Whether that distinction is appropriate is a question we need not consider in this case because of the unique nature of deportation." *Id.,* at 1481 (citation omitted). Thus, the Court declined to rule on the specific question before us: whether the

direct versus collateral consequences analysis is appropriate in assessing a claim of ineffectiveness in connection with entry of a plea. Instead, the starting point for the Court's analysis was that deportation was a unique consequence which did not lend itself to such an analysis. The Court, in examining the nature of deportation, observed:

We have long recognized that deportation is a particularly severe "penalty"; but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it "most difficult" to divorce the penalty from the conviction in the deportation context.

*Id.*, at 1481 (citations omitted). Because of deportation's "close connection to the criminal process," the Court concluded it was "uniquely difficult to classify as either a direct or collateral consequence[,]" and "[t]he collateral versus direct distinction is thus ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation." *Id.*, at 1482.

The Superior Court held that *Padilla* made it unclear whether the direct versus collateral consequences analysis was still viable in assessing ineffectiveness claims involving the consequences of a plea. The court went on to conclude pension forfeiture, like deportation, was so "intimately connected" to the criminal process that, like deportation, counsel was required to advise his client of the consequence of pension forfeiture. We disagree.

The provision of PEPFA which directs forfeiture provides: (a) Notwithstanding any other provision of law, no public official or public employee nor any beneficiary designated by such public official or public employee shall be entitled to receive any retirement or other benefit or payment of any kind except a return of the contribution paid into any

pension fund without interest, if such public official or public employee is convicted or pleads guilty or no defense to *any crime related to public office or public employment.*

(b) The benefits shall be forfeited upon entry of a plea of guilty or no defense or upon initial conviction and no payment or partial payment shall be made during the pendency of an appeal. If a verdict of not guilty is rendered or the indictment or criminal information finally dismissed, then the public official or public employee shall be reinstated as a member of the pension fund or system and shall be entitled to all benefits including those accruing during the period of forfeiture if any. *Such conviction or plea shall be deemed to be a breach of a public officer's or public employee's contract with his employer.*

43 P.S. § 1313(a)-(b) (emphasis added). PEPFA's definition of "[c]rimes related to public office or public employment" includes "[a]ny of the criminal offenses set forth in [18 Pa.C.S. § 3121 *et seq.*] . . . when the criminal offense is committed by a school employee . . . against a student." *Id.,* § 1312.

PEPFA contains no statement of purpose. It is triggered by a specific class of crimes which are particularly abhorrent when committed by those serving the public; that a plea to such crimes is deemed a breach of the employment contract suggests strongly that the statute is designed to ensure employees maintain their integrity while in public employment. That is, its goal is to restrict future benefits for public employees who commit certain crimes, a deterrent. PEPFA is not contained in Title 18, the Crimes Code; it is in Title 43, following the Unemployment Compensation Act, 43 P.S. § 751 *et seq.* PEPFA vests the authority to promulgate implementing regulations and to enforce its provisions in the State Employees Retirement Board. Although a public employee may appeal the retirement board's decision to the Commonwealth Court, these procedures do not contain the procedural requirements and safeguards associated with the criminal process. Common pleas courts and district attorneys are not involved in the forfeiture proceedings. All of these facts

suggest pension forfeiture is a non-punitive, civil consequence of a criminal conviction, independent of the criminal process.

■ This Court, in assessing PEPFA's legislative history, has noted PEPFA was designed to "promote integrity in public employment by imposing a forfeiture provision that would deter acts of criminal misconduct, thereby encouraging public employees to maintain standards of conduct deserving of the public's trust." *Mazzo v. Board of Pensions and Retirement of City of Philadelphia,* 531 Pa. 78, 611 A.2d 193, 196 (1992); *see Shiomos v. Commonwealth State Employes' Retirement Board,* 533 Pa. 588, 626 A.2d 158, 163 (1993) ("It is neither unconscionable nor unreasonable to require honesty and integrity during an employee's tenure in public service.").[7] The Commonwealth Court has also described PEPFA's purpose as promoting the public's trust in its employees and sanctioning employees who violate that trust. *See Apgar v. State Employes' Retirement System,* 655 A.2d 185, 189 (Pa. Cmwlth.1994) ("Because criminal conduct committed in the course of one's employment is a violation of the trust the people of the Commonwealth place in their employees, such conduct shall not be sanctioned.").

Additionally, the discussion on PEPFA when it was pending as a bill demonstrates its aim of preventing those who violate the public's trust from receiving the benefit of a taxpayer-funded pension: "What these amendments essentially are doing is drawing distinction between the high standard of conduct and the violation thereof that is incumbent on elected public officials.... In my travels throughout the Commonwealth, I have found that that is what is most prominent in the minds of our citizens." 1978 S. Jour. Vol. I, p. 448 (Statement

7. As one sister state has aptly observed:
 It has also been recognized that one of the "fundamental purposes" underlying the pensioning of civil servants is to "secure good behavior and the maintenance of reasonable standards of discipline during service." ... Forfeiture in this context has been viewed as within the Legislature's intendment to establish both a deterrent against committing misdeeds related to employment and as an inducement to continued faithful, diligent and efficient public service.
 *Uricoli v. Board of Trustees,* 91 N.J. 62, 449 A.2d 1267, 1271 (1982) (citations omitted).

of Senator Kelley). Floor debate in the House elicited similar comments:

This bill now not only applies to state employees but to all public employees. I think that is what the taxpayers of Pennsylvania want. They do not want a bill to be limited to just state employees. They want it to apply also to those people who are covered by the State Teacher Employment Fund and the municipal retirement funds.

1978 Pa.H.R. Jour. Vol. I, No. 35, p. 2431 (Statement of Representative Hayes).

Thus, PEPFA's aim is to ensure accountability and address corruption; it is triggered by an employee's breach of the public employment contract by commission of a very specific class of crimes. An employee who breaches his contract forfeits his right to deferred compensation for services rendered in the past. *See Mazzo,* at 196 ("[I]t has long been recognized in this Commonwealth that pensions for public employees are not mere gratuities provided by the employer, but rather are deferred compensation for services rendered in the past.") (citing *Commonwealth ex rel. Zimmerman v. Officers and Employees Retirement Board,* 503 Pa. 219, 469 A.2d 141, 142 (1983) (plurality opinion collecting cases)). Entitlement to the compensation that is deferred, however, is not without conditions, the relevant one being that the employee not commit any of the enumerated crimes.

Not getting money as a consequence of breaching an employment contract cannot be equated with being forced to leave the country. Based on PEPFA's aim, procedure, and consequences, we cannot conclude forfeiture of an employment benefit is so enmeshed in the criminal process that it cannot be subjected to a direct versus collateral consequences analysis. Accordingly, we hold *Padilla* did not abrogate application of such analysis in cases that do not involve deportation. *Frometa's* general holding remains: a defendant's lack of knowledge of collateral consequences of the entry of a guilty plea does not undermine the validity of the plea, and counsel is therefore not constitutionally ineffective for failure to advise a

defendant of the collateral consequences of a guilty plea. *Frometa*, at 93.

Having concluded a direct versus collateral consequences analysis is appropriate in this case, we look to the relevant case law. In addressing whether a result is a direct or collateral consequence of pleading guilty, this Court has stated, "[T]he distinction between a direct and collateral consequence of a guilty plea has been effectively defined by this Court as the distinction between a criminal penalty and a civil requirement over which a sentencing judge has no control." *Commonwealth v. Leidig*, 598 Pa. 211, 956 A.2d 399, 404 (2008) (citing *Commonwealth v. Duffey*, 536 Pa. 436, 639 A.2d 1174, 1176–77 (1994)).[8] In determining whether a provision is a criminal penalty or a civil requirement, this Court has adopted the analysis employed by the United States Supreme Court in *Smith, supra*, to assess whether a statute is punitive. *See Lehman, supra* (employing *Smith* test in determining whether Federal Gun Control Act is punitive, *ex post facto* law); *Commonwealth v. Williams*, 574 Pa. 487, 832 A.2d 962 (2003) (employing *Smith* test in determining whether Megan's Law II is punitive).

Under *Smith*, the first inquiry is whether the legislature's intent in enacting the provision at issue was punitive. *See Smith*, at 90–93, 123 S.Ct. 1140; *Lehman*, at 271; *Williams*, at 971. If the intent is found to be nonpunitive and therefore civil, the second inquiry is whether, despite this intent, "the statute is 'so punitive either in purpose or effect as to negate [the] intention to deem it civil.'" *Lehman*, at 271 (quoting *Smith*, at 92, 123 S.Ct. 1140) (internal quotations

8. In *Duffey*, we observed the collateral consequences of pleading guilty are numerous, and include loss of the right to vote, enlist in the armed services, own a firearm, hold a fishing license, inherit property, or practice a particular profession. *See Duffey*, at 1176 (citations omitted); *see also Frometa*, at 93 n. 1 (observing guilty plea may be grounds for divorce, termination of parental rights, disqualification from public office, or dismissal for cause from public employment). *Duffey* held the loss of driving privileges is a collateral consequence of a conviction for underage drinking, *Duffey*, at 1176, and *Leidig* held the registration requirements of Megan's Law II were a collateral consequence of a conviction for aggravated indecent assault, *Leidig*, at 404–06.

omitted); *see also Williams,* at 972. In applying the second prong, courts "ordinarily defer to the legislature's stated intent," and "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty[.]" *Smith,* at 92, 123 S.Ct. 1140 (internal quotations omitted). The second prong enlists seven factors as "useful guideposts" for determining whether the statute imposes criminal punishment. *See id.,* at 97, 123 S.Ct. 1140; *Lehman,* at 271; *Williams,* at 973. The factors, initially set forth in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), are:

> (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Williams,* at 973 (citing *Mendoza–Martinez,* at 168–69, 83 S.Ct. 554); *see also Smith,* at 97, 123 S.Ct. 1140; *Lehman,* at 271.

Turning to the present matter, the first inquiry under *Smith* is whether the legislature's intent in enacting PEPFA was punitive. As noted above, PEPFA functions to ensure public servants maintain integrity while in public employment. The chief intent behind the statute is to promote accountability, not to impose punishment.

Having found PEPFA was not enacted with punitive intent, we next examine the statute in light of the *Mendoza–Martinez* factors. *See Smith,* at 97, 123 S.Ct. 1140; *Lehman,* at 271–72; *Williams,* at 972–73. "The *Mendoza–Martinez* factors are 'neither exhaustive nor dispositive,' but they 'must be considered in relation to the statute on its face, and only the clearest proof will suffice to override legislative intent and transform . . . a civil remedy into a criminal penalty.'" *Lehman,* at 271–

72 (quoting *Smith,* at 97, 123 S.Ct. 1140; *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)). "One factor alone does not provide the 'clearest proof' [a statute] has a punitive purpose; each of the other factors must be evaluated." *Id.,* at 272.

The first factor is whether the sanction involves an affirmative disability or restraint. Certainly, the loss of deferred compensation may be affirmative, but it cannot be said to be so onerous as to be on the same plane as incarceration or deportation. *See Hudson,* at 104, 118 S.Ct. 488 ("[T]he sanctions imposed do not involve an 'affirmative disability or restraint,' as that term is normally understood[;][w]hile petitioners have been prohibited in further participating in the banking industry, this is certainly nothing approaching the infamous punishment of imprisonment.") (citation and quotation omitted).

Appellee's decision to retire followed the accusations stemming from his criminal conduct. It may be that he relied on the income from his pension when making that decision; it is equally possible his decision was not economic but an attempt to forestall the consequences of his acts. Regardless, as noted above, PEPFA is triggered by a public employee's breach of his public employment contract through the commission of certain crimes not befitting a public servant. Appellee may be precluded from receiving the funds to which he would otherwise be entitled, but he is not precluded from earning a living in some other capacity. The fact he chose to engage in behavior with serious consequences does not amount to a restraint.

The second factor is whether the statute has historically been regarded as a punishment. There is nothing in the legislative history or judicial precedent pertaining to PEPFA which suggests it has been viewed as punishment. Rather, as previously noted, the legislative intent underlying PEPFA is ensuring accountability and preventing employees who violate the public trust from receiving taxpayer-funded pensions. Furthermore, " 'whether a sanction constitutes punishment is not determined from the defendant's perspective, as even

remedial sanctions carry the sting of punishment.'" *Williams,* at 976 (quoting *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 777 n. 14, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994)).[9] Thus, while forfeiting his pension may feel punitive to appellee, historically, forfeiture has not been viewed as such. In this sense, he is not losing something he already had in hand—he is not getting something he would have received but for his misconduct.

The third factor is whether the statute comes into play only on a finding of *scienter.* Here, the statute states that *scienter* is not required for a person to forfeit a pension. PEPFA "is imposed on all those who have committed certain crimes in the past, regardless of intent or awareness of the statute." *Lehman,* at 272. All that was required for PEPFA to apply to appellee was that he be convicted of one of the offenses listed in Chapter 31 of the Crimes Code. *See* 43 P.S. § 1312 (defining crimes related to public office or public employment as any of offenses in Subchapter B of Chapter 31, when offense is committed by school employee against student); *id.,* § 1313 (no public employee shall be entitled to receive any retirement, other benefit, or payment of any kind if such employee pleads guilty to any crime related to public employment).

The fourth factor is whether the statute promotes the traditional aims of punishment—retribution and deterrence. PEPFA is aimed at promoting accountability by preventing those who violate the public's trust from receiving a benefit funded by the public. This Court has noted PEPFA was also designed to "deter acts of criminal misconduct, thereby encouraging public employees to maintain standards of conduct deserving of the public's trust." *Mazzo,* at 196. Retribution, however, has not been recognized as a goal of the statute.

The fifth factor is whether the behavior to which the statute applies is already a crime. As in *Lehman,* which dealt with a

**9.** *See LePrince v. Board of Trustees, Teachers' Pension and Annuity Fund,* 267 N.J.Super. 270, 631 A.2d 545, 549 (App.Div.1993) ("The 'punishment' [of pension forfeiture] is not punishment in the criminal sense, but rather is a collateral consequence of the employee's breach of the condition of honorable service. The 'punishment' is analogous to a judgment for damages arising out of a breach of contract.").

convicted felon's disqualification from purchasing firearms, "[t]his factor is inapplicable here because [appellee] has not been charged with violating the statute." *Lehman*, at 273. Although the statute is triggered by a guilty plea or conviction, the conduct to which it applies is the breach of the public trust by the commission of the crime.

The sixth and seventh factors are whether the statute has a rational connection to an alternative, non-punitive purpose, and whether the statute appears excessive in relation to such purpose. Although *Mazzo* mentioned deterrence as one aim of PEPFA, its primary aim, as also observed in *Mazzo*, *Shiomos*, and *Apgar, supra*, is to promote integrity in public employment by encouraging public employees and officials to maintain standards of conduct deserving of the public's trust. Should the employee breach that trust by committing one of the enumerated offenses, which include crimes of sexual impropriety with underage students, the Pennsylvania State Retirement Board is relieved of its contractual obligation to pay retirement benefits. Conditioning a public employee's entitlement to receive a taxpayer-funded pension on honorable completion of public service is not excessive in relation to the statute's purpose. PEPFA has a nonpunitive, alternative purpose, which it carries out by reasonable means.

Our assessment of the above factors leads us to conclude PEPFA's pension forfeiture provisions are not so punitive in force or effect as to negate the legislative intent that it be a civil, remedial provision. *See Smith*, at 92–93, 123 S.Ct. 1140; *Lehman*, at 271. PEPFA is not punitive, and is thus a collateral consequence of appellee's guilty plea.[10]

10. Other jurisdictions that have considered whether pension forfeiture statutes are criminal in nature, and thus punitive, have reached the same conclusion. In *MacLean v. State Board of Retirement*, 432 Mass. 339, 733 N.E.2d 1053 (2000), the Court, in rejecting the appellant's argument that pension forfeiture subjected him to double jeopardy, applied the "guideposts" described above and concluded revocation of pension benefits was not criminal punishment for double jeopardy purposes. *Id.*, at 1063. The Court noted the benefits were revoked by the state retirement board in a civil proceeding, and further observed although the pension forfeiture statute "certainly contains an element of deterrence, it also serves other, nonpunitive purposes, such as

Because counsel cannot be deemed ineffective for failing to advise a defendant regarding the collateral consequences of a plea, appellee's ineffectiveness claim fails. Therefore, we reverse the order of the Superior Court granting appellee a PCRA hearing on the issue of prejudice, and we remand for reinstatement of the PCRA court's order denying appellee relief.

Order reversed; case remanded. Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, and Justices SAYLOR and BAER join the opinion.

Chief Justice CASTILLE also files a concurring opinion.

Justice SAYLOR also files a concurring opinion in which Justices BAER and McCAFFERY join.

Justice TODD files a dissenting opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion in its entirety. I write separately only to address the foundational federal question, noted but not decided by the Majority, *see* Maj. Op. at 299 n. 6, 62 A.3d

protection of the public fisc and preserving respect for government service." *Id.* The Court concluded its decision was consistent with those of other jurisdictions that had ruled pension forfeiture statutes are civil in nature. *See id.* (citing *LePrince, supra; Retirement Bd. of the Employees' Retirement System of R.I. & Cranston v. Azar,* 721 A.2d 872 (R.I.1998)).

In *Busbee v. Division of Retirement,* 685 So.2d 914 (Fla.App.1996), the appellant claimed forfeiture of his pension after he pled guilty to accepting a bribe violated double jeopardy, due process, and the Eighth Amendment's prohibition against excessive fines. The Court rejected these claims, focusing on the contractual aspect of pension forfeiture; it noted the forfeiture proceedings were merely an action to enforce the terms of the pension contract and were not punishment for the crime of bribery. *Id.,* at 917–18. The law governing the Florida Retirement System provided for forfeiture of pension benefits upon conviction of bribery in connection with employment; therefore, the Court held when appellant elected to become a member of the system, the forfeiture provision was part of the pension contract between him and the state. *Id.,* at 916.

at 346–47 n. 6, of whether the U.S. Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), applies retroactively to a defendant in appellee's circumstances. The question of *Padilla's* retroactive applicability has been accepted for review but has not yet been resolved by the High Court; as the Majority notes, the Circuit Courts of Appeals and various district courts have otherwise divided on the issue. Notably, the Circuit split has arisen—and the U.S. Supreme Court agreed to decide the matter—after the case before us was briefed and argued.

*Padilla* was decided in March 2010, after appellee's conviction or plea became final, which raises a threshold question of whether appellee is entitled retroactively, on collateral review, to the application of the constitutional principle articulated in *Padilla*. *See Teague v. Lane*, 489 U.S. 288, 300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality) (retroactivity properly treated as threshold question). The parties assume that *Padilla* is not a new rule, and accordingly that its holding applies. The Majority accepts the assumption as presented, and passes on to the disputed merits question of whether *Padilla* abrogated the direct versus collateral consequences test adopted by this Court in *Commonwealth v. Frometa*, 520 Pa. 552, 555 A.2d 92 (1989). The Majority distinguishes *Padilla*, and holds that *Frometa* continues to apply in cases that do not involve deportation. I join the Majority, given the decisional posture of the case.

Pending guidance from the U.S. Supreme Court respecting the retroactive applicability of *Padilla* (to cases in varying procedural postures), and in light of this Court not passing upon *Padilla's* retroactive application to the circumstances here, the bench and bar in Pennsylvania are left with both a Third Circuit decision, *United States v. Orocio*, 645 F.3d 630 (3d Cir.2011), and a Superior Court decision, *Commonwealth v. Garcia*, 23 A.3d 1059 (Pa.Super.2011), having concluded that the case does not establish a new rule, and hence may apply retroactively. I am not so convinced, however. Generally, a constitutional principle announced by the High Court may apply retroactively to criminal cases on direct or collateral

review if it is an "old rule," *i.e.*, a result on new facts that was "dictated by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301, 109 S.Ct. 1060 (emphasis omitted). A "new rule" generally is applicable only to cases that are still on direct review with two exceptions that permit retroactive application on collateral review. *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). These exceptions apply: (1) if the decision "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe"; and (2) if the decision is a "watershed rule[ ] of criminal procedure" that "alter[s] our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction." *Teague*, 489 U.S. at 311, 109 S.Ct. 1060 (emphasis omitted).

In June 2011, the Third Circuit held that *Padilla* applied retroactively because the constitutional principle articulated by the U.S. Supreme Court "followed from the clearly established principles of the guarantee of effective assistance of counsel" and derived from precedent existing at the time of defendant's conviction. *United States v. Orocio*, 645 F.3d at 637 & 639. According to the Third Circuit, "[f]ar from extending the [Sixth Amendment ineffective assistance of counsel *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ] rule into uncharted territory, *Padilla* reaffirmed defense counsel's obligations to the criminal defendant during the plea process, a critical stage in the proceedings." *Id.* at 638. The court rejected the argument that the application of *Strickland* to the "new factual context" of warning criminal defendants of immigration consequences was a new rule for retroactivity purposes. *Id.* at 639 (citing *Teague* ). The Third Circuit applied *Padilla* retroactively to find Orocio's counsel constitutionally deficient under the first prong of *Strickland,* and remanded for an evidentiary hearing on the question of prejudice.[1]

1. In *Garcia,* the Superior Court addressed the issue of whether *Padilla* was an old or a new rule in a different context: the appellant argued that his PCRA petition, filed more than a year after his conviction

In August 2011, the U.S. Courts of Appeals for the Seventh Circuit and the Tenth Circuit rejected the Third Circuit's analysis and conclusion. *Chaidez v. United States,* 655 F.3d 684 (7th Cir.2011); *United States v. Chang Hong,* 671 F.3d 1147 (10th Cir.2011). Both the Seventh Circuit and the Tenth Circuit held that *Padilla* announced a new rule that did not fall within either of *Teague's* exceptions and, therefore, did not apply retroactively to cases on collateral review. According to the courts, although the decision in *Padilla* was grounded in and was an extension of *Strickland, Padilla* was not dictated or compelled by the decision in *Strickland,* and it was not "the sole reasonable interpretation of existing precedent." *Chaidez,* 655 F.3d at 692; *Chang Hong,* 671 F.3d at 1153–54. The decision in *Padilla* to apply *Strickland* to collateral civil consequences of a conviction was a "dramatic" shift in jurisprudence, and the result was "sufficiently novel" to qualify as a new rule. *Chaidez,* 655 F.3d at 690, 692–93; *Chang Hong,* 671 F.3d at 1155. Furthermore, while in *Chaidez* the parties agreed that neither exception to non-retroactivity applied, in *Chang Hong,* the Tenth Circuit rejected application of the exceptions after argument, holding that the *Padilla* rule was procedural but did not overcome the "watershed" requirement. According to the court, *"Padilla* is simply not germane to concerns about risks of inaccurate convictions or fundamental procedural fairness," concerns which are crucial to a finding that a rule, though new, should apply retroactively. *Chang Hong,* 671 F.3d at 1158–59.

In April 2012, the U.S. Supreme Court granted the petition for a writ of *certiorari* in the case decided by the Seventh Circuit—*Chaidez. See Chaidez v. United States,* —— U.S.

became final, was not time-barred because *Padilla* was a constitutional right newly recognized by the U.S. Supreme Court that was held by that court to apply retroactively. 23 A.3d at 1063 (citing 42 Pa.C.S. § 9545(b)(1)(iii)). The Superior Court rejected the argument and denied relief, holding that *Padilla* merely "clarified and refined the scope of a criminal defendant's long-standing constitutional right to the effective assistance of counsel during the guilty plea process." *Id.* at 1064 (footnote omitted). The procedural circumstance in *Garcia* effectively required the appellant to undertake a strategy opposite to that of the appellant in *Orocio,* the case decided by the Third Circuit.

——, 132 S.Ct. 2101, 182 L.Ed.2d 867 (2012) (*per curiam*). On appeal, Chaidez is seeking retroactive application of *Padilla*, ultimately, to obtain relief from a 2004 federal conviction on three counts of mail fraud, to which she pled guilty. *See* 655 F.3d at 686; 18 U.S.C. § 1341. The High Court entertained oral argument on November 1, 2012, and a decision should issue by the end of the term.

On the question of retroactivity in the context of state prisoners on collateral attack, for my part, I think the Seventh Circuit and Tenth Circuit have the better of this dispute; the Third Circuit's interpretation appears to be an unreasonable application of retroactivity principles. Even if appellee could prove that *Padilla* would command an award of relief, I would be inclined to deny PCRA relief because *Padilla* is a new and non-retroactive rule, and trial counsel cannot be deemed ineffective, in hindsight, for failing to predict the development.[2]

Justice SAYLOR, concurring.

In matters such as forfeiture, the direct and collateral consequences dichotomy has always seemed to me to be a nebulous one. Depending on the nature and severity of the forfeiture, there are often very reasonable grounds for disagreement as to the appropriate categorization, and the ultimate judicial categorization seems to me to carry too much subjectivity to be self-sustaining as a matter of pure reason.

Nevertheless, this Court's precedent embodies the direct versus collateral consequences inquiry; the *Padilla* Court

2. As a point in clarification, I would also note that, read in isolation, the provision of the Public Employee Pension Forfeiture Act ("PEPFA") cited by the Majority speaks in the present tense, *i.e.,* "is," and ostensibly would apply only to a conviction or a guilty plea by a current public employee, and not to an already retired or former employee like appellee. Thus, that provision would not put counsel on notice of the collateral consequence. *See* 43 P.S. § 1313(a). The definitional section of PEPFA, however, appears to extend the application of the forfeiture provision to retired employees. 43 P.S. § 1312 (defining "public official" or "public employee" as "[a]ny person who is elected or appointed to any public office or employment ... or who is acting or who has acted in behalf of the Commonwealth or a political subdivision or any agency thereof including but not limited to any person who has so acted and is otherwise entitled to or is receiving retirement benefits...."). A political subdivision includes a school district. *Id.*

expressly refrained from addressing the appropriateness of the test in the Sixth Amendment context, *see Padilla v. Kentucky*, 559 U.S. 356, ——, 130 S.Ct. 1473, 1481, 176 L.Ed.2d 284 (2010) ("Whether that distinction is appropriate is a question we need not consider in this case because of the unique nature of deportation."); and the limited threshold question which has been put before the Court is whether *Padilla* undermines the direct versus collateral consequences test in a matter outside the deportation arena. *See* Majority Opinion, at 298, 62 A.3d at 346.

In terms of the second issue presented (i.e., the application of the direct versus collateral consequences test), I view the majority's approach as being consistent with the tenor of the prior decisions, as courts have generally resisted characterizing the instant types of losses as punitive.[1] Accordingly, while I might reach a different conclusion were this entirely a matter of first impression, I find the majority decision to be a correct one in view of the existing authority.

Finally, I appreciate that courts must be circumspect about widening the avenues for after-the-fact plea challenges. Although I find it troubling that counsel may not have advised Appellee of a very substantial collateral consequence of his plea, ultimately, my vote is to join the majority opinion.

Justices BAER and McCAFFERY join this Concurring Opinion.

1. *See, e.g., Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960) (holding that the termination of social security benefits does not constitute punishment for purposes of, *inter alia*, the Ex Post Facto Clause); *cf. Artway v. Attorney Gen. of N.J.*, 81 F.3d 1235, 1266 (3d Cir.1996) (concluding that, in evaluating whether the "sting" of an otherwise civil, remedial measure is so harsh that it constitutes punishment, case precedent "does not tell us where the line falls that divides permissible from impermissible effects, but we know [it] is somewhere between imprisonment and revocation of citizenship on the one hand, and loss of a profession *or benefits* on the other" (emphasis added)); *Commonwealth v. Williams*, 574 Pa. 487, 832 A.2d 962 (2003) (suggesting that the loss of monetary benefits is not severe enough to be deemed excessive for purposes of the final prong of the seven-factor test announced in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

316

Justice TODD, dissenting.

I respectfully dissent. In light of the United States Supreme Court decision in *Padilla v. Kentucky,* 559 U.S. 356, 130 S.Ct. 1473, 1480–81, 176 L.Ed.2d 284 (2010), I believe the direct versus collateral consequences analysis employed by the majority is inappropriate to resolve Appellee's claim · of his attorney's ineffectiveness for failing to advise him that he would lose his monthly pension benefit upon entry of his guilty plea.

In *Padilla,* the high Court reaffirmed and emphasized the fundamental principle that, under the Sixth Amendment to the United States Constitution, "[b]efore deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.'" *Padilla* at 1480–81 (quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), and citing *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). *Accord Missouri v. Frye,* —— U.S. ——, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012) (recognizing Sixth Amendment right to effective assistance of counsel extends to plea bargaining process); *Lafler v. Cooper,* —— U.S. ——, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012) (recognizing defendants have a Sixth Amendment right to effective assistance of counsel during plea negotiations). The Court ruled that an attorney's duty under the Sixth Amendment to provide effective assistance of counsel during the plea process encompassed advising the client about the potential consequence of deportation as the result of entering a guilty plea to a federal narcotics conviction. *Padilla* thereby seemingly rejected the rationale employed by our Court in our prior decision of *Commonwealth v. Frometa,* 520 Pa. 552, 555 A.2d 92 (1989), wherein we concluded that counsel was not ineffective for failing to warn his client that a guilty plea to various drug offenses could result in the client's deportation. Nevertheless, the majority herein presently concludes that *Frometa* survives as support for the **general** proposition that a defendant's Sixth Amendment right to the effective assistance of counsel is not violated whenever counsel fails to inform the defendant of collateral consequences—other

than deportation—resulting from the entry of a guilty plea, even if those consequences will have a severe impact on the defendant's life. Thus, relying on *Frometa*, the majority holds that counsel in this matter was under no obligation to warn Appellee that his plea of guilty to indecent assault, 18 Pa. C.S.A. § 3126(a)(8), would, due to the automatic triggering of the provisions of the Public Employee Pension Forfeiture Act ("PEPFA"), result in the forfeiture of his monthly pension benefits, as the majority considers such consequences to be merely collateral.

I believe the majority's reliance on *Frometa* is misplaced because the high Court indicated in *Padilla* that counsel's Sixth Amendment duty to warn his or her client of an adverse consequence of a guilty plea is not dependent on whether the consequence can be labeled direct or collateral; rather, it is determined by the severity of the consequence, and the degree to which the consequence and the underlying criminal proceeding are closely connected. *Padilla* suggests that where a specific consequence is a "particularly severe 'penalty,' " is "intimately related to the criminal process," and the statutory provisions providing for the imposition of the consequence are "succinct, clear, and explicit" and, thus, can "easily be determined" by a reading of the statutory text, *Padilla*, 130 S.Ct. at 1481–83, counsel's Sixth Amendment duty of effective representation includes warning the client of that consequence when advising him or her whether or not to take a plea. Therefore, under *Padilla*, in situations such as those presented by the case at bar where the consequence of a guilty plea is manifestly severe and certain to result upon the entry of the plea, I would deem the mechanistic direct/collateral consequence rubric of *Frometa* to have no continuing vitality.

In arriving at its broad holding that counsel's duty to provide adequate assistance to a defendant contemplating a guilty plea does not include advising the defendant about any collateral consequences of a plea, the *Frometa* Court reasoned that, "a defendant's lack of knowledge of the collateral consequences of pleading guilty does not undermine the validity of his plea." *Frometa*, 520 Pa. at 555, 555 A.2d at 93. The

Court noted that, in addition to being "both numerous and remote," collateral consequences "are irrelevant to the determination of whether a guilty plea was entered **voluntarily and knowingly**." *Id.* at 555–56, 555 A.2d at 93 (emphasis added). However, the resolution of the question of whether a guilty plea has been entered voluntarily and knowingly is a determination of whether the defendant has been accorded due process under the Fifth and Fourteenth Amendments to the United States Constitution in connection with the entry of the plea. *See McCarthy v. U.S.*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) ("[I]f a defendant's guilty plea is not . . . voluntary and knowing, it has been obtained in violation of due process and is therefore void.") (footnote omitted). In the high Court's view, a guilty plea will be considered voluntary, and the defendant deemed to have been accorded the requisite due process in conjunction with its entry, only if the defendant has been made aware of the direct consequences of the plea. *See Brady v. United States*, 397 U.S. 742, 753, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) ("[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats . . . misrepresentation . . . or . . . perhaps by promises that are by their nature improper." (internal quotation marks omitted)).

*Frometa*, however, seemingly treats this same factor as dispositive in ascertaining whether counsel fulfilled his or her duty under the Sixth Amendment to provide reasonable professional assistance to a client in the plea process.[1] In the *Frometa* Court's view, so long as counsel has informed the defendant of all direct consequences of the plea, his duty under the Sixth Amendment to his client is at an end. Whatever solidity and strength this analysis may have once possessed, it has been seriously eroded by the rationale employed by the high Court in *Padilla.*

---

1. Our Court regards direct consequences as penalties that are criminal in nature and within the authority of the sentencing judge to impose. *Commonwealth v. Leidig*, 598 Pa. 211, 220, 956 A.2d 399, 404 (2008).

After noting the disagreement among various state and federal courts in how to distinguish between direct and collateral consequences, the high Court in *Padilla* pointedly reminded it has "**never** applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland.*" *Padilla,* 130 S.Ct at 1481 (emphasis added). Although the Court went on to state that it was not necessary in that case to consider the broader question of whether the direct/collateral consequence distinction was appropriate to evaluate plea counsel's effectiveness in failing to warn of a specific consequence of a plea, it so concluded only because of the "unique nature" of deportation. *Id.* In its analysis, the Court found it to be of paramount significance that deportation, even though the result of civil proceedings, and not a criminal sanction, was, nevertheless, a "particularly severe penalty," and one which was "intimately related to the criminal process." *Id.* (internal quotation marks omitted). The Court found that, because the law had "enmeshed criminal convictions and the penalty of deportation for nearly a century," and because deportation was "nearly an automatic result for a broad class of offenders," it was "most difficult to divorce the penalty from the conviction." *Id.* (internal quotation marks omitted). The Court noted that it was this "close connection" to the criminal process which made deportation "uniquely difficult to classify as either a direct or a collateral consequence" and, as a result, rendered "[t]he collateral versus direct distinction ... ill-suited" to evaluating this *Strickland* claim. *Padilla,* 130 S.Ct at 1482.

In my view, the high Court's discussion in this regard has import beyond those instances in which the consequence of the plea is deportation but, rather, is applicable in all instances where the consequence is of similar severity in its impact on the life of the individual entering the plea. *See Padilla,* 130 S.Ct. at 1484 ("It is quintessentially the duty of counsel to provide her client with available advice about an issue **like** deportation and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis.'") (quoting *Hill v. Lockhart,*

474 U.S. 52, 62, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)) (emphasis added). This prospect of wider applicability was specifically noted by Justice Alito in his concurrence in *Padilla*,[2] who observed that there are a variety of serious consequences besides deportation which result from a criminal conviction, which the Court had never previously held implicated the attorney's duty under the Sixth Amendment, and that it considered the *Padilla* majority to have embarked on a "dramatic departure from precedent." *Padilla*, 130 S.Ct. at 1488 (Alito, J., concurring).

I, too, conclude the *Padilla* majority departed from the direct/collateral rubric as the sole dispositive factor establishing counsel's duty under the Sixth Amendment to advise a client of the consequences of a guilty plea, in favor of one that looks to whether the consequence of the plea is severe and certain.[3] Consequently, I regard *Frometa*, which deemed this direct/collateral distinction to be pivotal, as no longer viable, and the "direct versus collateral consequences analysis" utilized by the majority in this matter, Majority Opinion at 296–301, 62 A.3d at 345–48, "ill-suited" to resolve Appellee's claim. *Padilla*, 130 S.Ct. at 1482.

With respect to the first criteria articulated in *Padilla*—that the consequence be a particularly severe penalty—I disagree with the majority's minimization of the impact of Appellee's loss of his monthly pension benefit for the duration of his life, and that of his wife if he predeceased her. *See* Majority Opinion at 304, 62 A.3d at 350 ("Not getting money as a consequence of breaching an employment contract cannot be equated with being forced to leave the country.") In my view, Appellee's loss of $1,500.00 per month, which represented a form of deferred compensation to Appellee in lieu of wages for services he previously rendered during his entire working

---

**2.** Justice Alito's concurring opinion was joined by Chief Justice Roberts.

**3.** I agree with the majority herein that the general issue of whether *Padilla* may be retroactively applied to cases on collateral review is not presently before us, as the parties and the Superior Court have proceeded on the assumption that it is applicable to this matter. *See* Majority Opinion at 299 n. 6, 62 A.3d at 346–47 n. 6.

career as a public employee,[4] constituted a particularly severe penalty for a 67–year–old retiree. Indeed, the total monetary value of this loss could total hundreds of thousands of dollars. Appellee's Brief at 12. Most critically, as Appellee himself described it, this monthly pension payment was his "means of subsistence." Declaration of Appellee, 3/18/09, at 3.[5] Further, nothing in the record suggests that Appellee or his wife had financial resources to offset this loss. Thus, although Appellee may not have been physically banished from the country, he has, as a consequence of his plea, nevertheless suffered a severe economic hardship. The enormity of this financial loss, from my perspective, renders this consequence a particularly severe penalty.

Likewise, I believe this case meets the second criteria discussed in *Padilla*—namely, the fact that the pension forfeiture was intimately related to the underlying criminal offense. In *Padilla*, the Court found that the penalty of deportation was intimately related to the underlying drug conviction because deportation had been "enmeshed" with criminal proceedings under the two statutory schemes, and, also, because the consequence was "nearly an automatic result" of the plea. *Padilla*, 130 S.Ct. at 1481. PEPFA, by its design and basic structure, is inextricably "enmeshed" with our Crimes Code as it is only upon a plea of guilty or conviction for one of the specific criminal offenses enumerated in PEPFA, committed during the course of public employment, that the pension forfeiture provisions are triggered. Relevant to the case *sub judice*, the penalty of pension forfeiture for a school employee was specifically conjoined with the criminal offense of indecent

4. *Mazzo v. Board of Pensions and Retirement of City of Philadelphia*, 531 Pa. 78, 84, 611 A.2d 193, 196 (1992) ("[P]ensions for public employees are not mere gratuities provided by the employer, but rather are deferred compensation for services rendered in the past.")

5. This sworn declaration was attached to Appellee's PCRA petition. The Commonwealth, in its answer to Appellee's petition, did not contest these factual averments. Inasmuch as the trial court did not conduct an evidentiary hearing in this matter, and dismissed the petition pursuant to Pa.R.Crim.P. 907, which allows for summary dismissal when the trial court determines there is no genuine issue concerning any material fact and the petitioner is entitled to judgment as a matter of law, I accept these averments as true for purposes of appellate review.

assault when the legislature amended PEPFA in 2004 to include indecent assault and other sexual crimes in PEPFA's definition of "crimes relating to public employment." *See* Act No. 2004–86, S.B. No. 971, "Labor–Pension Forfeiture–Sexual Offenses by School Employees," Preamble. Further, for a public employee such as Appellee, PEPFA unambiguously provides that "benefits shall be forfeited upon entry of a plea of guilty." 43 P.S. § 1313(b). Hence, the forfeiture penalty at issue in this case is not just "nearly automatic", as was the deportation consequence in *Padilla;* rather, it was **certain** to occur upon Appellee's entry of a plea to the charge of indecent assault. Additionally, the provisions of PEPFA providing for automatic forfeiture are quite "succinct, clear, and explicit," and their applicability to Appellee's situation could have "easily be[en] determined" by a simple reading of the plain text of PEPFA.[6] *Padilla,* 130 S.Ct. at 1483. Thus, in my view, the penalty of pension forfeiture is so closely connected to the underlying criminal process in this matter that it is " 'most difficult' to divorce the penalty from the conviction." *Padilla,* 130 S.Ct. at 1481.

Because, in the wake of *Padilla,* a direct/collateral consequences analysis of Appellee's claim of counsel ineffectiveness is unsuitable, I conclude Appellee's claim should be resolved by employing the *Strickland* analysis utilized by the Court in *Padilla.* The Court noted that *Strickland* first required it to "determine whether counsel's representation 'fell below an objective standard of reasonableness.' " *Padilla,* 130 S.Ct. at 1482 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052).

6. Section 1312 of PEPFA unambiguously defines crimes committed by a public employee which trigger pension forfeiture as "[a]ny of the criminal offenses set forth in [18 Pa.C.S. § 3121 et. seq.] when the criminal offense is committed by a school employee as defined in 24 Pa.C.S. § 8102 (relating to definitions) against a student." 43 P.S. § 1312. Section 1312 also clearly establishes Appellee's status as a public employee for purposes of PEPFA by defining a public employee, *inter alia,* as "all persons who are members of any retirement system funded in whole or in part by the Commonwealth or any political subdivision." 43 P.S. § 1312. Section 1313(b) of PEPFA states, in relevant part: "The [retirement] benefits shall be forfeited upon entry of a plea of guilty or no defense or upon initial conviction and no payment or partial payment shall be made during the pendency of an appeal." 43 P.S. § 1313(b).

The Court observed that this determination of "constitutional deficiency[ ] is necessarily linked to the legal community's practice and expectations," which measures attorney performance according to the standard of " 'reasonableness under prevailing professional norms.' " *Padilla*, 130 S.Ct. at 1482 (quoting *Strickland*, 466 U.S. at 688, 694). The Court specifically reminded that, in determining the professional norms against which the reasonableness of counsel's performance must be gauged, it had "long . . . recognized that prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable." *Padilla*, 130 S.Ct. at 1482 (internal quotations and citations omitted). The Court further elaborated: "Although they are 'only guides,' and not 'inexorable commands,' these standards may be valuable measures of the prevailing professional norms of effective representation." *Id.* (citations omitted).

Based on its examination of the standards for representation of a client in a criminal matter as promulgated by various professional associations such as the National Legal Aid and Defender Association, the American Bar Association, state professional standards for indigent defense, and treatises on criminal practice, the Court concluded that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* (citations omitted). The Court also examined the text of the statutory provisions which compelled deportation upon conviction and found them to be "succinct, clear, and explicit in defining the removal consequence for [the defendant's] conviction." *Id.* at 1483. The Court remarked that "counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute." *Id.* Ultimately, the Court concluded that it was "not a hard case in which to find deficiency: The consequences of [the defendant's] plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." *Id.*

The Court went on in its discussion to emphasize that it is of no moment whether counsel has committed an "act of omis-

sion" rather than an "act of commission." *Id.* at 1484. Instead, the Court specifically recognized that plea counsel has a duty to "provide [the] client with available advice about an issue **like** deportation" and "the failure to do so clearly satisfies the first prong of the *Strickland* analysis." *Id.* (emphasis added) (citation omitted). The Court then stated it had "little difficulty concluding that [the defendant] has sufficiently alleged that his counsel was constitutionally deficient." *Id.* at 1486–87. The Court therefore remanded the case to the lower court for a determination of whether the defendant could show prejudice which, in the guilty plea context, the Court previously defined as "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

When these principles are applied to assess the performance of Appellee's counsel in the instant matter, I conclude they support the Superior Court's determination that Appellee's counsel had a duty to warn Appellee about the loss of his pension upon entry of his guilty plea, and that his counsel's failure to do so raises a claim of arguable merit that he was ineffective. In examining the same professional standards of representation for counsel in a criminal matter which were looked to by the Court in *Padilla,* I note that the weight of prevailing professional norms requires counsel to advise a client who is considering a guilty plea to an offense of the possible forfeiture of his assets which may result from the plea. *See* National Legal Aid and Defender Assn., *Performance Guidelines for Criminal Representation* § 6.2(a) (1995) (explaining that counsel's duty in plea negotiations includes becoming "fully aware of" and making sure that the client "is fully aware of: ... (2) the possibility of forfeiture of assets."); American Bar Association, *Standards for Criminal Justice, Pleas of Guilty: Defense Function,* Standard 14–3.2(f) (3d. ed. 1999) ("To the extent possible, defense counsel should determine and advise the defendant, sufficiently in advance of the entry of any plea, as to the possible collateral consequences that might ensue from entry of the contemplated plea"; ac-

companying explanatory history of this standard discusses the range of these possible consequences which includes forfeiture of property, defense counsel's duty to interview his client and determine which of the consequences are most important to the client given his individual circumstances, and noting that sexual offenses are most likely to have the most serious collateral consequences); Dept. of Justice, Office of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, H–6, H–9, H–12 and H–14 (2000).[7]

In the case *sub judice,* because of his consultations with Appellee, counsel should have been aware of the importance Appellee placed on his pension. According to Appellee, he specifically discussed with counsel prior to retirement the effect the timing of this retirement would have on the monthly pension benefit he would receive, and counsel advised him that "retirement was [his] best option, as it would minimize exposure to the media regarding the case and the charges." Declaration of Appellee, 3/18/09, at 3. Yet, despite this knowledge and counsel's explicit recommendation to Appellee to retire, the record is devoid of any evidence that counsel ascertained what effect the plea agreement would have on Appellee's pension. As discussed above, a plain reading of the relevant statutory provisions of PEPFA indicate that his client, as a retired school teacher who received his pension from the Pennsylvania Public School Employees Retirement System, stood to lose the **entirety** of his monthly pension if he accepted the plea to indecent assault. To reiterate, Section 1313 of PEPFA provides that the retirement benefits of a "public employee" will "be forfeited upon entry of a plea of guilty." 43 P.S. § 1313. Because counsel did not warn Appellee of the loss of his monthly pension upon entering his plea to

7. This was a survey of state standards of practice funded by the United States Department of Justice which offered examples of "best practices" developed by states for attorney performance. With respect to an attorney's representation of the client in plea process the survey referenced the professional standards of Oregon, Massachusetts, and New Mexico, all of which require that an attorney who is representing a client during the plea process inform the client of the possibility of either asset forfeiture or civil liabilities which may result from the plea.

the offense of indecent assault, in my view, counsel's performance fell below prevailing professional norms. Thus, I conclude the Superior Court correctly determined that Appellee established the first two prongs of the tripartite ineffective assistance of counsel test promulgated by our Court in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987)[8]—namely, that his claim has arguable merit, and that counsel's performance fell below the standard of "reasonable professional assistance" required by the Sixth Amendment. I also agree with the Superior Court that Appellee should receive a hearing so that it may be established whether he was prejudiced by counsel's performance, i.e., that there is a reasonable probability that, but for counsel's failure to warn him of the consequence of pension forfeiture, he would have rejected the plea agreement and proceeded to trial. *Hill v. Lockhart, supra.* Consequently, I respectfully dissent and would affirm the decision of the Superior Court.

8. As we previously have noted: "Although the Pennsylvania test for ineffectiveness [articulated in *Pierce* ] is the same as *Strickland's* two-part performance and prejudice standard, in application this Court has characterized the test as tripartite, by dividing the performance element into two distinct parts, i.e., arguable merit and lack of reasonable basis." *Commonwealth v. Washington*, 592 Pa. 698, 713 n. 8, 927 A.2d 586, 594 n. 8 (2007).