# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP2433-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |        Plaintiff-Respondent, |
| |    v. |
| | Stephen LeMere, |
| |        Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(No cite)

| | |
|---|---|
| OPINION FILED: | May 20, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 17, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Eau Claire |
|   JUDGE: | Kristina M. Bourget |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | BRADLEY, A. W., J. dissents, joined by ABRAHAMSON, J. |
|   NOT PARTICIPATING: | BRADLEY, R. G., J. did not participate |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Edward J. Hunt* and *Hunt Law Group, S.C.,* Milwaukee, and oral argument by *Edward J. Hunt.*

For the plaintiff-respondent, the cause was argued by *Sarah L. Burgundy,* assistant attorney general, with whom on the brief was *Brad D. Schimel,* attorney general.

**2016 WI 41**

No. 2013AP2433-CR
(L.C. No. 2011CF333)

STATE OF WISCONSIN : IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

State of Wisconsin,

      Plaintiff-Respondent,

  v.

Stephen LeMere,

      Defendant-Appellant-Petitioner.

**FILED**

**MAY 20, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals affirming the circuit court's judgment convicting Stephen LeMere (LeMere) of first-degree sexual assault of a child under the age of 13 and affirming its order denying his postconviction motion to withdraw his plea.[1]

---

[1] State v. LeMere, No. 2013AP2433-CR, unpublished order (Wis. Ct. App. Oct. 16, 2014).

¶2  In Padilla v. Kentucky, 559 U.S. 356 (2010), the Supreme Court of the United States held that the Sixth Amendment requires defense counsel to inform a client whether his plea to a criminal charge carries a risk of deportation.  Here, we assess Padilla in a different context: Does the Sixth Amendment require defense counsel to inform a client about the possibility of civil commitment, under Wis. Stat. ch. 980,[2] when the client enters a plea to a sexually violent offense?  We conclude that it does not and thus affirm the decision of the court of appeals.

## I.  Factual and Procedural Background

¶3  The charges against LeMere arose out of events that occurred after a gathering in the City of Eau Claire on Friday evening, May 13, 2011, at the home of J.C. and his wife, A.C. LeMere was then 24.  During the gathering, LeMere and another visitor drank the majority of two 30 packs of beer, in addition to other alcohol in the house.  LeMere also took a narcotic pain killer.  Although his memory of the evening became "fuzzy," LeMere recalled playing drinking games throughout the night.

¶4  Also present that evening was C.R.C., J.C.'s 12-year-old sister.  As Friday night wore on, C.R.C. fell asleep on the couch in the living room.  Around 5:30 on Saturday morning, C.R.C. awoke to the sound of LeMere opening his cell phone.

---

[2] All references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

LeMere began sending text messages to A.C.'s phone, which C.R.C. had borrowed from her sister-in-law.

¶5    LeMere's first message to C.R.C. said something similar to "will you have sex with me?"  C.R.C. responded with a message saying, "No, I'm 12 years old, what are you doing, creeped out."  LeMere sent two more messages.  Although LeMere eventually took A.C.'s phone away from C.R.C. and deleted the messages, C.R.C. later recalled that one message said something to the effect of "I know you're young but you're cute for a young girl," while the other said something along the lines of "I want to have sex with you."  C.R.C. sent messages back saying "No."[3]

¶6    Feeling uncomfortable, C.R.C. left the living room and went into the kitchen.  While sitting on a chair, she heard the floor creaking outside the kitchen door.  She stood up and walked over to investigate, whereupon LeMere suddenly popped out and grabbed her by the throat, placing her in a choke hold in the hallway.  He placed the sharp edge of a knife against her

---

[3] The next morning, J.C., who had been asleep with AC in another room, discovered three messages from C.R.C. on his phone.  One message, received at 5:31 a.m., said, "Can one of you guys come out here, I'm scared."  Another, received at 5:57 a.m., said, "Can you let me in the room."  Suspicious, J.C. asked to see LeMere's phone.  He found no messages in LeMere's sent messages folder but reviewed four messages in the inbox. One message from A.C.'s phone read, "I'm 12 years old, what are you doing, I'm 12 years old, I'm going to tell [J.C.] and [A.C.]"

3

throat.    C.R.C., struggling to breathe, asked him, "[P]lease don't."

¶7    Telling her to shut up and not say anything, LeMere grabbed her arm and brought her into the kitchen, where he pushed her against the refrigerator.  Holding the knife to her neck with one hand, he used his other hand to fondle her vaginal area and insert his finger into her vagina.  At some point, LeMere told C.R.C. that he would find her and kill her if she told anyone about what had happened.  Gathering her strength, C.R.C. pushed LeMere away, grabbed A.C.'s cell phone from the kitchen table, and ran outside.  There, she used A.C.'s phone to call her mother and asked to be picked up from the house.

¶8    In a criminal complaint filed May 18, 2011, the State charged LeMere with one count of first-degree sexual assault of a child under the age of 13, contrary to Wis. Stat. §§ 948.02(1)(e) and 939.50(3)(b); one count of second-degree reckless endangerment, contrary to Wis. Stat. §§ 941.30(2) and 939.50(3)(g); and one count of strangulation and suffocation, contrary to Wis. Stat. §§ 940.235(1) and 939.50(3)(h).  After LeMere's initial appearance and a subsequent preliminary hearing, the State filed an information, charging LeMere with the same three counts.

¶9    At an arraignment in early June 2011, LeMere pleaded not guilty.  His counsel asked the court to reduce the $20,000 cash bond set at LeMere's initial appearance, but the court denied the request.

4

¶10 Although the court set an August 2011 trial date, that date changed multiple times after a series of continuances. LeMere's counsel sought the first continuance in early August 2011 after receiving medical records and a DNA report from the State indicating the presence of LeMere's semen in C.R.C.'s underwear and on a vaginal swab. The court granted the request and adjourned the trial to give LeMere an opportunity to conduct an independent review of the medical and DNA evidence. During the status conference on the motion for continuance, the court——at the request of LeMere's counsel——confirmed on the record that LeMere did not feel that the adjournment would abridge his right to a speedy trial.

¶11 In mid-September, LeMere requested that the court appoint new counsel. At a status conference originally scheduled for the purpose of setting a new trial date, the court approved the request. A few days later, the State Public Defender appointed George Miller as LeMere's new counsel. Attorney Miller first appeared on LeMere's behalf in early October 2011, at which time the court set a new trial date for the first week of February 2012.

¶12 Before the February trial could go forward, Attorney Miller filed a motion on LeMere's behalf requesting a competency evaluation and a second adjournment of the trial. In an attached affidavit, Attorney Miller explained that LeMere had made a suicide attempt and had subsequently received treatment in a hospital's behavioral health unit. Based on the suicide attempt and statements that LeMere made to Attorney Miller and

5

to guards at the Eau Claire County Jail, Attorney Miller concluded that LeMere was not competent to stand trial. The court approved the request and adjourned the trial for a second time. However, by the middle of February 2012, LeMere's competency no longer remained in doubt, so the court set an April 2012 trial date.

¶13 A status conference scheduled for the middle of March 2012 became a plea hearing when counsel for the parties informed the court[4] that they had negotiated a plea agreement. Under the agreement, LeMere agreed to plead guilty to first-degree sexual assault of a child under the age of 13, contrary to Wis. Stat. §§ 948.02(1)(e) and 939.50(3)(b). The State agreed to ask the court to dismiss and read in not only the other two charges in the information——for second-degree reckless endangerment and for strangulation and suffocation——but also all charges against LeMere in a separate case arising out of an incident that occurred during LeMere's incarceration.[5] Furthermore, while the agreement allowed each party to argue for whatever sentence it deemed appropriate, the State agreed to request an initial confinement period no greater than 30 years, rather than the 40-year maximum available to the court.

---

[4]  Lisa K. Stark, Judge.

[5] The other case involved battery charges brought against LeMere after he used a broom head to strike and seriously injure a fellow inmate in the county jail.

¶14 After Attorney Miller provided the court with LeMere's plea questionnaire and waiver of rights form at the plea hearing, the court engaged in a plea colloquy. The court addressed potential consequences of LeMere's plea, including possible immigration repercussions, loss of his right to vote, prohibition of firearm possession, sex-offender registration requirements, and other limits that would affect him as a sex offender.

¶15 As part of its discussion about the consequences of the plea, the court engaged in the following exchange with LeMere:

> [THE COURT:] In addition, although not necessarily likely, I do have to tell you that if you are incarcerated and the State thought it appropriate, they could petition for what's called a Chapter 980, or habitual——or that's not what it's called. It's a—— I'm sorry. I'm blanking on the name of the statute. As a sexually violent person, which could require further incarceration on a civil basis past criminal. I don't know that will happen. I don't think that it likely will, but I don't know that. I just want to be sure you understand that that's a potential.
>
> Now, did you understand what I just said to you about probation, election, firearms, limitations on your ability to work, sex offender registry, and the sexually violent offender issue?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Has anything I've talked about changed your mind about what you want to do here?
>
> THE DEFENDANT: No, ma'am.
>
> THE COURT: Do you have any questions for me?
>
> THE DEFENDANT: No, ma'am.

THE COURT: Anything you don't understand about what we've talked about here?

THE DEFENDANT: No, ma'am.

¶16 Earlier in the hearing, the court confirmed that LeMere harbored no concerns about his own ability to understand the proceedings. Attorney Miller similarly affirmed for the court that he believed that LeMere could comprehend the exchange with the court. The court added its own observation regarding LeMere's demeanor and capabilities:

> I would note that Mr. [LeMere] is sitting at counsel table. He doesn't appear unduly anxious. He seems very solemn. He from his——at least observing his facial demeanor, he appears that he understands the seriousness of this matter. He's answering my questions appropriately, and I do find that he understands what he's doing, and he's capable of proceeding here today.

¶17 Based on LeMere's responses throughout the plea colloquy, the court accepted his guilty plea for first-degree sexual assault of a person under the age of 13. Consistent with the plea agreement, the court dismissed and read in the other charges. At a subsequent sentencing hearing, the court ordered 30 years of initial confinement followed by 15 years of extended supervision. The court entered the judgment of conviction on August 3, 2012.

¶18 One year later, LeMere filed a motion in the circuit court[6] seeking to withdraw his plea and vacate his conviction.[7]

---

[6] Kristina M. Bourget, Judge.

[7] LeMere's Wis. Stat. § 974.02 motion to withdraw his guilty plea, filed August 22, 2013, was timely under Wis. Stat.

(continued)

LeMere claimed that his guilty plea was neither informed nor knowing.  He argued that he did not receive effective assistance of counsel because his attorney never informed him that, at the end of the confinement portion of his sentence, he might be subject to civil commitment under Chapter 980.  In an accompanying affidavit, LeMere set forth a detailed basis for his withdrawal request:

> Prior to the change of plea hearing, I met with George Miller, the attorney appointed to represent me.  We discussed the case.  However, Attorney Miller at no time told me that a conviction for the crime of 1st

---

§ 809.30 despite the fact that he filed it more than a year after his August 3, 2012 sentencing.

Just three days after sentencing, LeMere filed his Notice of Intent to Seek Post-Judgment Relief, well within the 20-day time limit for notice set forth in § 809.30(2)(b).  But on February 7, 2013, LeMere's postconviction attorney appointed by the State Public Defender's office filed two motions: one motion with the circuit court seeking permission to withdraw, pursuant to Wis. Stat. § 809.30(4)(a), and one motion with the court of appeals requesting an extension of time for LeMere to file a postconviction motion or notice of appeal.  The State Public Defender agreed to appoint new counsel, who filed a notice of appearance on March 21, 2013.  The court of appeals granted the extension, allowing LeMere's new counsel to file a notice of appeal or a postconviction motion by April 29, 2013.

Over the succeeding months, LeMere's new counsel filed three more motions for extension of time, each of which the court of appeals granted.  In response to the third request, the court of appeals set an August 22, 2013 deadline for filing a postconviction motion or notice of appeal.  Thus, the extensions kept LeMere's postconviction motion and subsequent appeal within the Wis. Stat. § 809.30 timeline, meaning "the time for appeal or postconviction remedy provided in s. 974.02" had not expired such that LeMere would need to file his motion to withdraw his guilty plea under Wis. Stat. § 974.06.

Degree Child Sexual Assault——Sexual Contact with Person under Age of 13 could make me subject to lifetime commitment as a sexually violent person under Chapter 980. If I had been aware of the Chapter 980 consequence by counsel, I would not have entered a plea of guilty on March 26, 2012. I would have insisted on taking this case to trial. In the time between my guilty plea and my sentencing hearing, Attorney Miller never discussed with me that I could be subject to lifetime commitment as a sexually violent person under Chapter 980. If I had been made aware of this consequence of my guilty plea in the period between my plea of guilty and my sentencing hearing, I would have insisted that Attorney Miller file a motion to withdraw my guilty plea.

He also requested an evidentiary hearing pursuant to State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶19 The circuit court denied the motion for postconviction relief on the grounds that the facts alleged in LeMere's affidavit, "if true, [did] not constitute deficient performance of counsel." In reaching that conclusion, the court read the Padilla case as limited to deportation and inapplicable to the possible consequence of civil commitment under Chapter 980. LeMere filed his notice of appeal on October 23, 2013, appealing from both the judgment of conviction entered in August 2012 and the October 2013 order denying his motion for postconviction relief.

¶20 The court of appeals summarily affirmed. State v. LeMere, No. 2013AP2433-CR, unpublished order (Wis. Ct. App. Oct. 16, 2014). Relying on its decision in State v. Myers, 199 Wis. 2d 391, 544 N.W.2d 609 (Ct. App. 1996), that "a potential Wis. Stat. ch. 980 commitment at some time in the future is merely a 'collateral consequence' of a guilty plea," the court

10

applied the rule that "no manifest injustice occurs when a defendant is not apprised of consequences that are collateral to the plea." LeMere, unpublished order at 2. As a result, the court of appeals determined that LeMere was not denied the effective assistance of counsel. Moreover, the court of appeals concluded that it had no authority to overrule Myers by extending Padilla beyond the deportation context to require advice about Chapter 980 civil commitment. Id. at 3 (citing Cook v. Cook, 208 Wis. 2d 166, 185-90, 560 N.W.2d 246 (1997)).

¶21 On November 17, 2014, LeMere filed a petition for review, which we granted on March 16, 2015.

## II.  Standard of Review

¶22 Before sentencing, a circuit court should freely allow a defendant to withdraw his plea for any fair and just reason, unless the prosecution would be substantially prejudiced. State v. Jenkins, 2007 WI 96, ¶2, 303 Wis. 2d 157, 736 N.W.2d 24; State v. Bollig, 2000 WI 6, ¶28, 232 Wis. 2d 561, 605 N.W.2d 199. Where, as here, a defendant seeks plea withdrawal after sentencing, the burden on the defendant is much higher: "[A] defendant seeking to withdraw a guilty or no contest plea after sentencing must prove manifest injustice by clear and convincing evidence." State v. Negrete, 2012 WI 92, ¶29, 343 Wis. 2d 1, 819 N.W.2d 749.

¶23 "Ineffective assistance of counsel is one type of manifest injustice." State v. Ortiz-Mondragon, 2015 WI 73, ¶28, 364 Wis. 2d 1, 866 N.W.2d 717. Claims for ineffective assistance of counsel are mixed questions of fact and law, and

we will uphold a circuit court's factual findings so long as they are not clearly erroneous. State v. Shata, 2015 WI 74, ¶31, 364 Wis. 2d 63, 868 N.W.2d 93 (citing State v. Carter, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695). "Whether counsel's performance satisfies the constitutional standard for ineffective assistance of counsel is a question of law, which we review de novo." State v. Thiel, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305.

### III. Discussion

¶24 The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Article I, Section 7 of the Wisconsin Constitution similarly prescribes that "[i]n all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel." As the Supreme Court explained in Strickland v. Washington, 466 U.S. 668 (1984), "the right to counsel is the right to the effective assistance of counsel." Strickland, 466 U.S. at 686 (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). Criminal defendants have the right to effective assistance of counsel not only at trial but also during the plea bargaining process. Missouri v. Frye, 132 S. Ct. 1399, 1405-06 (2012) (citing Hill v. Lockhart, 474 U.S. 52, 57 (1985)).

¶25 To succeed on a claim that his counsel provided ineffective assistance, a defendant must prove that (1) counsel performed deficiently and (2) the defendant suffered prejudice as a result of the deficient performance. Thiel, 264

12

Wis. 2d 571, ¶18 (citing Strickland, 466 U.S. at 687). Deficient performance occurred if "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

¶26 "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. "Counsel need not be perfect, indeed need not even very good, to be constitutionally adequate." Thiel, 264 Wis. 2d 571, ¶19 (quoting State v. Williquette, 180 Wis. 2d 589, 605, 510 N.W.2d 708 (Ct. App. 1993), which had quoted Dean v. Young, 777 F.2d 1239, 1245 (7th Cir. 1985), cert. denied, 475 U.S. 1142 (1986)). But Padilla made clear that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment" and may be the basis for a claim that counsel provided ineffective assistance. Padilla, 559 U.S. at 366; see also Chaidez v. United States, 133 S. Ct. 1103, 1112 (2013).

¶27 Last term, in State v. Shata and State v. Ortiz-Mondragon, we evaluated the scope of counsel's obligation to provide effective assistance, as described in the second part of Padilla. Given Padilla's conclusion that advice about deportation is not categorically excluded from Sixth Amendment protection, Shata and Ortiz-Mondragon examined the scope of an attorney's obligation to provide advice about immigration consequences. In particular, the cases focused on the relationship between the advice an attorney must give and the degree of certainty that serious immigration consequences will result from a plea. See Shata, 364 Wis. 2d 63, ¶5 (holding that

13

an attorney's advice that a "guilty plea carried a 'strong chance' of deportation" constituted effective assistance where "deportation was not an absolute certainty"); Ortiz-Mondragon, 364 Wis. 2d 1, ¶5 (concluding that an attorney's advice that a plea carried a "risk" of adverse immigration consequences was sufficient where federal immigration law was not "succinct, clear, and explicit" that the pending charge "constituted a crime involving moral turpitude" (quoting Padilla, 559 U.S. at 368)).

¶28  In this case, LeMere turns our attention back to the categorical analysis in the first part of Padilla.  He argues that Padilla's categorical reasoning with regard to deportation applies with equal force to the possibility of civil commitment under Chapter 980 for people convicted of sexually violent offenses.  Whether Padilla's reasoning extends to collateral consequences beyond deportation is a matter of first impression in Wisconsin.

¶29  To assess LeMere's claim, we must examine why the Supreme Court concluded that deportation cannot be viewed as "merely a 'collateral' consequence" of a criminal conviction.  Padilla, 559 U.S. at 359-60.  We then discuss civil commitment under Chapter 980 and determine that the Sixth Amendment does not require counsel to advise defendants regarding the possibility of civil commitment as a sexually violent person.

A.  Padilla's Effect on Sixth Amendment Doctrine

¶30  Our discussion begins with an explanation of the Sixth Amendment analytical framework that the Supreme Court altered in

14

Padilla.  Before Padilla, state and federal courts evaluating the scope of the right to effective assistance of counsel "almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation."  Chaidez, 133 S. Ct. at 1109 & nn.7-8 (citing cases from 10 federal appellate courts and appellate courts in 27 states and the District of Columbia).  Drawing on Due Process principles applicable to courts accepting guilty pleas, courts had held that, to render effective assistance, counsel needed to advise defendants about direct consequences of a plea but not collateral consequences. Gabriel J. Chin & Richard W. Holmes, Jr., Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 703-04 (2002).

¶31 Direct consequences are those that have a "definite, immediate, and largely automatic effect on the range of a defendant's punishment."  State v. Byrge, 2000 WI 101, ¶60, 237 Wis. 2d 197, 614 N.W.2d 477 (citing State v. Bollig, 2000 WI 6, ¶16, 232 Wis. 2d 561, 605 N.W.2d 199); see also State ex rel. Warren v. Schwarz, 219 Wis. 2d 615, 636, 579 N.W.2d 698 (1998). Collateral consequences, on the other hand, "are indirect and do not flow from the conviction"; rather, they "may be contingent on a future proceeding in which a defendant's subsequent behavior affects the determination" or may "rest[] not with the sentencing court, but instead with a different tribunal or government agency."  Byrge, 237 Wis. 2d 197, ¶61; see also Warren, 219 Wis. 2d at 636.

¶32 In his Padilla dissent, Justice Scalia provided a constitutional foundation for the distinction between direct consequences and collateral consequences: "The Sixth Amendment guarantees the accused a lawyer 'for his defence' against a 'criminal prosecutio[n]'——not for sound advice about the collateral consequences of conviction." Padilla, 559 U.S. at 388 (Scalia, J., dissenting) (alteration in original).

> We have until today at least retained the Sixth Amendment's textual limitation to criminal prosecutions. "[W]e have held that 'defence' means defense at trial, not defense in relation to other objectives that may be important to the accused." Rothgery v. Gillespie County, 554 U.S. 191, 216 (2008) (Alito, J., concurring) (summarizing cases). We have limited the Sixth Amendment to legal advice directly related to defense against prosecution of the charged offense . . . .
>
> There is no basis in text or in principle to extend the constitutionally required advice regarding guilty pleas beyond those matters germane to the criminal prosecution at hand . . . .
>
> Adding to counsel's duties an obligation to advise about a conviction's collateral consequences has no logical stopping point.

Id. at 389-90 (first alteration in original).

¶33 Of course, the Padilla majority, in the opinion written by Justice Stevens, pointedly noted that the Court had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under Strickland." Padilla, 559 U.S. at 365. Nonetheless, the opinion artfully responded to Justice Scalia's critique, not by "eschew[ing] the direct-

16

collateral divide across the board," Chaidez, 133 S. Ct. at 1112, but by implying that deportation was a sui generis consequence rather than a collateral consequence. Justice Stevens wrote for the Court that "[d]eportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence." Padilla, 559 U.S. at 366 (emphasis added).

¶34 Regardless of how it was argued, the Court's holding in Padilla that the Sixth Amendment right to effective assistance of counsel requires counsel to advise defendants about the deportation consequences of their pleas was a departure from precedent and "breach[ed] the previously chink-free wall between direct and collateral consequences" for Sixth Amendment purposes. Chaidez, 133 S. Ct. at 1110.

¶35 Padilla clearly affected Wisconsin law. Like courts in other states, the Wisconsin court of appeals had applied the distinction between direct and collateral consequences in the Sixth Amendment context. State v. Santos, 136 Wis. 2d 528, 531, 401 N.W.2d 856 (Ct. App. 1987) ("Deportation is a collateral consequence of a plea. . . . [D]efendants need not be informed of the collateral consequences of a guilty plea."), abrogated by Padilla, 559 U.S. 356; see also State v. Brown, 2004 WI App 179, ¶7 n.3, 276 Wis. 2d 559, 687 N.W.2d 543 ("[D]efense counsel's failure to advise a defendant of collateral consequences is not a sufficient basis for an ineffective assistance of counsel claim.").

17

¶36 LeMere now seeks to extend the holding in Padilla to a consequence beyond deportation. This requires us to examine what characteristics of deportation made it an exception to the general direct-collateral framework under the Sixth Amendment.

¶37 Padilla involved a lawful permanent resident who had lived in the United States for more than 40 years but faced "virtually mandatory" deportation under federal law after he pled guilty to transporting a substantial quantity of marijuana in his tractor-trailer. Padilla, 559 U.S. at 359. Padilla had agreed to plead guilty only after his counsel advised him that, because he had been in the country for a long time, he did not need to worry about the plea's deportation consequences. Id. During postconviction proceedings, Padilla alleged that he received ineffective assistance of counsel and would have insisted on proceeding to trial had he known the true immigration consequences of his plea. Id. The Supreme Court of Kentucky concluded that Padilla had no Sixth Amendment claim for ineffective assistance for faulty advice about the collateral consequence of deportation. Id. at 359-60. It then denied his request to withdraw his plea.

¶38 The Supreme Court reversed, concluding that "[t]he collateral versus direct distinction is . . . ill suited to evaluating a Strickland claim concerning the specific risk of deportation." Id. at 366 (emphasis added). "[B]ecause of its close connection to the criminal process," deportation fits into neither of the two traditional categories. Id. Although not a criminal punishment, the Court reasoned, deportation is

18

nevertheless "particularly severe," unlike other civil consequences frequently deemed collateral. Id. at 365. Most collateral consequences do not amount to "the equivalent of banishment or exile." Id. at 373 (quoting Delgadillo v. Carmichael, 332 U.S. 388, 391 (1947)). Moreover, the Court noted, for many non-citizens deportation becomes "nearly an automatic result" of a conviction. Id. at 366. Relevant federal immigration statutes spell out in "succinct, clear, and explicit" terms Padilla's immediate eligibility for deportation as a result of his conviction. Id. at 368.

¶39 Three years later, the Supreme Court conducted a valuable analysis of Padilla when asked to decide whether Padilla applied retroactively. Chaidez involved a lawful permanent resident whose conviction subjecting her to mandatory deportation became final in 2004. Chaidez, 133 S. Ct. at 1105-06. At the time she entered her guilty plea, her attorney never advised her that the conviction could expose her to deportation. Id. at 1106. Immigration officials commenced removal proceedings in 2009 after Chaidez applied for citizenship and her criminal conviction surfaced. Id. Hoping to avoid removal, she initiated a collateral attack against her guilty plea on grounds that her counsel provided ineffective assistance by failing to advise her of the deportation consequences of her plea. Id.

¶40 While the district court was considering her challenge, the Supreme Court decided Padilla. Id. Therefore, Chaidez sought retroactive application of Padilla, and the

19

Supreme Court was required to consider Padilla under Teague v. Lane, 489 U.S. 288 (1989), to determine whether Padilla had stated a "new rule" of law. Chaidez could not take advantage of a decision rendered years after her conviction became final if Padilla had articulated a new rule of law. Chaidez, 133 S. Ct. at 1107.

¶41 In concluding that Padilla stated a new rule and that Chaidez could not rely on it to challenge her plea, the Court began by distinguishing Padilla from Strickland. Id. at 1108. The Court observed that before the Padilla opinion engaged in traditional Strickland analysis, it answered a "threshold question":

> Was advice about deportation 'categorically removed' from the scope of the Sixth Amendment right to counsel because it involved only a 'collateral consequence' of a conviction, rather than a component of the criminal sentence? In other words, prior to asking how the Strickland test applied ("Did this attorney act unreasonably?"), Padilla asked whether the Strickland test applied ("Should we even evaluate if this attorney acted unreasonably?").

Id. (citation and footnote omitted). In short, before the Padilla Court ever addressed the first prong of the Strickland test, it had to decide whether the Sixth Amendment applied at all. Id. at 1111.[8]

---

[8] The Supreme Court of Utah has applied Chaidez in this manner, citing Chaidez for the proposition that, "when the alleged deficient performance is defense counsel's failure to inform a client of a particular consequence of a guilty plea, we must first consider whether Strickland applies at all." State v. Trotter, 330 P.3d 1267, 1271 (Utah 2014) (holding that Padilla does not extend the Sixth Amendment to require counsel
(continued)

20

¶42 At one point, the Chaidez opinion appeared to focus on two factors——"the severity of the penalty and the 'automatic' way it follows from conviction"——to explain the "special 'nature of deportation'" and why the "collateral versus direct distinction" was "'ill-suited' to dispose of Padilla's claims." Chaidez, 133 S. Ct. at 1112 (quoting Padilla, 559 U.S. at 366). Upon reflection, we think the Court viewed deportation as distinct from other consequences for multiple reasons.[9]

¶43 Central to the Padilla Court's analysis was its emphasis on deportation as a "unique" consequence of conviction. As the Chaidez Court explained, Padilla "did not eschew the direct-collateral divide across the board." Id.[10] On the

_____

to advise defendants about the collateral consequence of sex offender registration), cert. denied, 135 S. Ct. 944.

[9] But see Trotter, 330 P.3d at 1272 ("[T]he Court determined that deportation is uniquely ill-suited for the direct-collateral divide because (1) it results automatically from the entry of the plea, and (2) it is a particularly severe penalty. Accordingly, any rationale for extending Padilla's reasoning to other contexts . . . must be rooted in both of these justifications." (citation omitted)).

[10] The Court's comment regarding the survival of the direct-collateral distinction as a general rule has important consequences in Wisconsin in light of Padilla's abrogation of State v. Santos, 136 Wis. 2d 528, 401 N.W.2d 856 (Ct. App. 1987). In Santos, the defendant, a Cuban immigrant, sought postconviction withdrawal of his guilty plea to burglary charges. Santos, 136 Wis. 2d at 529-30. He argued that his counsel provided ineffective assistance by failing to inform him that the guilty plea could form the basis for his deportation. Id. at 530. The court of appeals held that Santos did not receive ineffective assistance because deportation is a collateral consequence of a conviction and counsel need not inform defendants of collateral consequences. Id. at 531-33.

(continued)

contrary, the Padilla Court twice used the word "unique" to describe the situation. Padilla, 559 U.S. at 365 (mentioning "the unique nature of deportation" (emphasis added)); id. at 366 ("Deportation as a consequence of criminal conviction is . . . uniquely difficult to classify as either a direct or a collateral consequence [of a criminal conviction]." (emphasis added)). The Padilla Court understood the meaning of "unique." To call something "unique" is to say that it is "the only one of its kind." Webster's Third New International Dictionary 2500 (1986). Throughout Padilla, the Court identified a number of factors that set deportation apart from other consequences.

¶44 Certainly, the severe and automatic nature of deportation are both factors that contribute to its unique character. The Padilla Court deemed deportation "a particularly severe 'penalty,'" and the Court used other similar adjectives and phrases——"harsh," "drastic," "unjust," the "equivalent of banishment," "exile"——throughout the opinion. Padilla, 559 U.S. at 360-62, 373. Additionally, the Court used some variation on the word "automatic" four times, and it emphasized the "virtually mandatory," "virtually inevitable," "practically

---

Notwithstanding Padilla's implicit abrogation of Santos with regard to the specific consequence of deportation, see Chaidez, 133 S. Ct. at 1109 & n.8, the Court's reasoning in Chaidez indicates that the general direct-collateral framework applied in Santos persists, id. at 1110-11; cf. Commonwealth v. Abraham, 62 A.3d 343, 350 (Pa. 2012) ("Padilla did not abrogate application of [a direct versus collateral consequences] analysis in cases that do not involve deportation.").

inevitable," "automatic," "nearly . . . automatic" nature of deportation after certain criminal convictions.  Id. at 359-60, 364-66.

¶45 But beyond the severe and automatic aspects of deportation, the Padilla Court also considered its "close connection to the criminal process."  Id. at 366.  Several times, the Court explained that, although removal proceedings are civil in nature, "deportation is nevertheless intimately related to the criminal process.  Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century."  Id. at 365-66.  "[W]e find it 'most difficult' to divorce the penalty from the conviction in the deportation context."  Id. at 366 (quoting United States v. Russell, 686 F.2d 35, 38 (D.C. Cir. 1982)).  In the past, federal and state judges were able to make a binding recommendation against deportation (JRAD) at the time of sentencing.  Id. at 361-63.  Today, defense counsel "may be able to plea bargain creatively with the prosecution in order to craft a conviction and sentence that reduce the likelihood of deportation."  Id. at 373.

¶46 Highlighting deportation's close connection to criminal sanctions, the Padilla Court described deportation as a "penalty" at least five times: (1) "[D]eportation is an integral part——indeed, sometimes the most important part——of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes."  Id. at 364 (footnote omitted).  (2) "We have long recognized that deportation is a particularly severe 'penalty.'"  Id. at 365 (citing Fong Yue Ting v. United States,

23

149 U.S. 698, 740 (1893)).  (3) "Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century."  Id. at 365-66 (citation omitted).  (4) "[W]e find it 'most difficult' to divorce the penalty from the conviction in the deportation context."  Id. at 366 (quoting Russell, 686 F.2d at 38).  (5) "[T]he threat of deportation may provide the defendant with a powerful incentive to plead guilty to an offense that does not mandate that penalty in exchange for a dismissal of a charge that does."  Id. at 373.

¶47  Finally, it must be noted that not all people convicted of certain crimes face deportation as a potential consequence of conviction; only noncitizens face deportation's penal effects.  Indeed, the Padilla Court used the word "noncitizen" 17 times and appeared to view noncitizens——"a class of clients least able to represent themselves"——as a particularly vulnerable class.  Id. at 370-71.

¶48  A unique confluence of factors thus led the Padilla Court to articulate an extraordinary exception to the direct-collateral framework——which the court otherwise declined to disturb——for the "penalty" of deportation.  In light of this exception, we now examine whether the possibility of civil commitment under Chapter 980 warrants a similar exception.

B.  Evaluating the Consequence of Chapter 980 Commitment

¶49  To determine whether the Sixth Amendment requires counsel to advise defendants about the possibility of Chapter 980 commitment, we review the same factors that set deportation apart from other consequences.

24

## 1. Deportation's Unique Nature Weighs Against Creating an Exception for Chapter 980 Commitment

¶50 At the outset, we reemphasize that Padilla created a "new rule" when it determined that deportation was not "categorically removed from the ambit of the Sixth Amendment's right to counsel." Padilla, 559 U.S. at 366. The Court created the new rule, in large part, because of "the unique nature of deportation." Id. at 365. Extending Padilla to embrace the possibility of Chapter 980 commitment would initiate a more far-reaching "new rule" not yet articulated by the Supreme Court. It would deviate from the characterization of deportation as "unique." And, inevitably, it would do more than widen the breach in the substantially chink-free wall between direct and collateral consequences——it would effectively tear down that wall. Chapter 980 commitment cannot be described as anything other than a classic collateral consequence. State v. Myers, 199 Wis. 2d 391, 394, 544 N.W.2d 609 (Ct. App. 1996). Thus, without a directive and clear guidance from the Supreme Court, this court would be discarding any logical stopping point by establishing a new obligation under the Sixth Amendment to advise a defendant about a collateral consequence. Padilla, 559 U.S. at 390 (Scalia, J., dissenting).[11]

---

[11] For example, the National Inventory of Collateral Consequences of Conviction, a database created by the American Bar Association, identifies as many as 693 collateral consequences of conviction in Wisconsin. Am. Bar Ass'n, National Inventory of Collateral Consequences of Conviction

(continued)

2.  The Severity of Chapter 980 Commitment

¶51  Padilla emphasized the severity of deportation, using such phrases as the "harsh consequences" of deportation, which is a "drastic measure."  Id. at 360 (majority opinion).  Chaidez reiterated that deportation is "particularly severe."  Chaidez, 133 S. Ct. at 1117 & n.4.  Non-citizens confronted with deportation "face possible exile from this country and separation from their families."  Padilla, 559 U.S. at 370. Deportation creates a permanent physical separation from the United States and, to a lesser extent, from people who live here.  If a person confronted with removal wished to maintain relationships with friends and family who live in this country, deportation's permanent physical separation could create a more onerous burden than time served in an American prison.  The person's friends and family likely would need to spend hundreds, if not thousands, of dollars on international travel expenses for a single physical reunion.

¶52  LeMere argues that commitment under Chapter 980 is even more severe than removal from the country because commitment could last for the remainder of his lifetime.  He observes that a person deported from the United States remains entirely free outside this country and retains substantial personal liberty.  A person committed under Chapter 980, he argues, is confined under state control for an indefinite period

(2013), http://www.abacollateralconsequences.org/search/?jurisdiction=50.

26

of time, even after serving time in prison. By focusing on the worst case scenario as though it were the norm, however, LeMere overstates, to a degree, the severity of Chapter 980 commitment. Although a person will remain committed "until such time as the person is no longer a sexually violent person," Wis. Stat. § 980.06, Chapter 980 delineates numerous and regular procedures for reevaluating whether a person's commitment should continue.

¶53 Chapter 980 commitment is not intended to be permanent. Within the first year after the person's commitment, the Department of Health Services (DHS) must conduct a new examination of the person's mental condition to determine whether discharge or supervised release would be appropriate. Wis. Stat. § 980.07(1). Similar reevaluations follow annually after the first year. Wis. Stat. § 980.07(1). Furthermore, a person may bring a petition for discharge from commitment at any time, Wis. Stat. § 980.09(1), and may file a petition for supervised release on an annual basis, Wis. Stat. § 980.08(1). These frequent reevaluations assure that a person remains committed no longer than is necessary for treatment purposes.[12]

¶54 Nevertheless, any time spent civilly committed results in a deprivation of liberty for the person subject to

---

[12] A 2012 DHS report regarding discharge and supervised release from Chapter 980 commitments indicates that the 59 patients discharged between 2009 and 2011 experienced commitments lasting approximately 8 to 9 years, on average. Gina Olson, WI Chapter 980 SVP Discharge & Supervised Release 3, 8 (2012), https://www.dhs.wisconsin.gov/sites/default/files/l egacy/SandRidge/InformationalPapers/C980Discharge1.pdf.

commitment. See State v. Post, 197 Wis. 2d 279, 302, 541 N.W.2d 115 (1995). Despite regular reviews, the possibility undeniably exists that a person, once committed, will receive annual reports indicating that he or she remains a sexually violent person and has not made sufficient progress in treatment to earn outright discharge or even supervised release. As Justice Kennedy described Kansas's civil commitment framework, "Notwithstanding its civil attributes, the practical effect of the . . . law may be to impose confinement for life." Kansas v. Hendricks, 521 U.S. 346, 372 (1997) (Kennedy, J, concurring); see also State v. Nelson, 2005 WI App 113, ¶15, 282 Wis. 2d 502, 701 N.W.2d 32 ("A Chapter 980 commitment . . . could be lifelong.").

¶55 Accordingly, we acknowledge that civil commitment under Chapter 980 is a severe consequence. Chapter 980 commitment's continued deprivation of liberty after the end of a prison sentence makes it severe, particularly when it becomes "potentially indefinite." Post, 197 Wis. 2d at 314; see also Hendricks, 521 U.S. at 364. Once again, however, it is not designed or intended to be permanent. Chapter 980 commitment's rehabilitative function——"provid[ing] care and treatment to those with mental disorders that predispose them to sexual violence," Post, 197 Wis. 2d at 302——moderates its severity. The rehabilitative objective at the core of commitment ensures that commitment is not necessarily as permanent a consequence as deportation's banishment would be. In sum, Chapter 980

commitment, though severe, is not as uncompromisingly severe a consequence as deportation.

### 3. Chapter 980 Commitment Is Not Penal

¶56 The rehabilitative aspect of Chapter 980 commitment also takes it out of the "penalty" category. Chapter 980 "creates a civil commitment procedure primarily intended to protect the public and to provide concentrated treatment to convicted sexually violent persons, not to punish the sexual offender." State v. Carpenter, 197 Wis. 2d 252, 258, 541 N.W.2d 105 (1995) (emphasis added). "The emphasis on treatment in ch. 980 is evident from its plain language." Id. at 266. "[T]reatment is a bona fide goal of this statute . . . ." Post, 197 Wis. 2d at 308.

¶57 In upholding a similar statute from Kansas, the Supreme Court explained that "commitment under the Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." Hendricks, 521 U.S. at 361-62. The Court added:

> Hendricks focuses on his confinement's potentially indefinite duration as evidence of the State's punitive intent. That focus, however, is misplaced. Far from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others.

Id. at 363. The Supreme Court could not characterize civil commitment under Chapter 980 and similar statutes as a "penalty"

29

without jeopardizing the now well-established constitutionality of these statutes.

4.  Chapter 980 Commitment Is Not an Automatic Result of the Underlying Conviction

¶58  Under federal law, a non-citizen convicted of certain offenses, like the drug offense in Padilla, automatically satisfies a statutory condition that serves as the basis for deportation.  In contrast, a person convicted of a sexually violent offense in Wisconsin does not automatically meet the definition of "sexually violent person," which requires proof of dangerousness beyond the fact of conviction.  Indeed, Chapter 980 requires a second trial regarding the person's dangerousness and mental condition, and that trial occurs only if the Wisconsin Department of Justice or a district attorney petitions for commitment.  These procedural requirements distinguish commitment under Chapter 980 from deportation under federal law and show that even a Chapter 980 petition is not an inevitable consequence of a conviction for a sexually violent offense.

¶59  In Padilla, the Court explained that, under current federal law, "if a noncitizen has committed a removable offense . . . , his removal is practically inevitable." Padilla, 559 U.S. at 363-64 (emphasis added).  As we explained in Shata, "[T]he Court meant that Padilla was automatically deportable upon conviction, not that he would be automatically deported."  Shata, 364 Wis. 2d 63, ¶61.  Nevertheless, had immigration officials chosen to initiate removal proceedings

30

against Padilla, his conviction would already have made him "eligible for deportation" under the federal statutes. Padilla, 559 U.S. at 368 (citing 8 U.S.C. § 1227(a)(2)(B)(i)). A person who meets one of the "grounds of deportability under section 1227(a)" may be subject to removal proceedings under 8 U.S.C. § 1229a(a)(2) (2012). To secure removal, the government "has the burden of proving by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable." 8 U.S.C. § 1229a(c)(3)(A). Sufficient evidence based on a conviction includes an "official record of judgment and conviction" and an "official record of plea, verdict, and sentence," among other documents. Id. § 1229a(c)(3)(B). Though a person facing deportation does receive a hearing on the matter, the Supreme Court had good reason to describe deportation as "practically inevitable" upon conviction. Padilla, 559 U.S. at 364.

¶60 An examination of the procedures in Chapter 980 demonstrates that, in contrast, proof of conviction of a sexually violent offense does not alone provide a sufficient basis for a court to determine that a person qualifies as a sexually violent person for civil commitment purposes. Chapter 980 "prescribes a detailed procedure that the State must follow in order to commit a sexually violent person." State v. Gilbert, 2012 WI 72, ¶21, 342 Wis. 2d 82, 816 N.W.2d 215. A sexually violent person is someone convicted of a sexually

violent offense specified under Wis. Stat. § 980.01(6)[13] who also has been determined to be "dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence."  Wis. Stat. § 980.01(7).

¶61 When a person convicted of a sexually violent offense comes due for release from the confinement portion of a sentence of imprisonment, the Wisconsin Department of Justice or a district attorney may choose to file a petition alleging that the person meets the definition of "sexually violent person." Wis. Stat. § 980.02(1).  Shortly after the filing, a court must determine whether probable cause exists to believe that the person fits the definition.  Wis. Stat. § 980.04.  If the court finds probable cause and orders the person's continued detention, the person will receive a trial, which may be to a jury, to determine whether he or she is sexually violent.  Wis. Stat. § 980.05(1)-(2).   The person enjoys many procedural rights.  See, e.g., Wis. Stat. §§ 980.031, 980.034, 980.036. Furthermore, a person will not be found a "sexually violent person" unless the State persuades the finder of fact beyond a reasonable doubt.  Wis. Stat. § 980.05(3).

¶62 In treating Chapter 980 commitment as a collateral consequence of conviction, the court of appeals has similarly

---

[13] LeMere pleaded guilty to first-degree sexual assault of a child under the age of 13 contrary to Wis. Stat. § 948.02(1)(e), a sexually violent offense under Wis. Stat. § 980.01(6)(a).

described how "commitment will not automatically flow from . . . conviction":

> Although such a commitment will require a prior predicate offense, [the defendant's] offense, by itself, will not trigger a commitment. Rather, a commitment will depend on [the defendant's] condition at the time of the ch. 980 proceeding and the evidence that the State will then present on his condition. If the State were to initiate such commitment proceedings, [the defendant] will have the full benefit of the ch. 980 procedures, due process, and an independent trial, including the right to offer evidence to refute the State's charges.

Myers, 199 Wis. 2d at 394.

¶63 The nature of the second round of proceedings——which require proof beyond a reasonable doubt that a person convicted of a sexually violent offense also is a sexually violent person——distinguishes Chapter 980 commitment from deportation. By virtue of his drug-trafficking conviction alone, Padilla became deportable under federal law. Padilla, 559 U.S. at 359 n.1 (citing 8 U.S.C. § 1227(a)(2)(B)(i)). Mere proof of the fact of his conviction would be sufficient for the federal government to secure removal. Conviction of an offense defined as sexually violent under Chapter 980 does not similarly bring a person within the definition of "sexually violent person" by default. Instead, the State must still prove the second element of the definition of sexually violent person——that the person convicted of the sexually violent offense also is "dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence." Wis. Stat. § 980.01(7). Given that the state must prove not

33

just the fact of conviction but also a degree of dangerousness, it is far from "inevitable" that a person convicted of a sexually violent offense will also be adjudged a sexually violent person.

¶64 LeMere urges us to adopt the reasoning applied by the Supreme Court of Illinois in People v. Hughes, 983 N.E.2d 439 (Ill. 2012), a decision that extended Padilla to require advice about the possibility of commitment as a sexually violent person under Illinois law.[14]   Evaluating Illinois's civil commitment statute, the court observed that "it is certain that a person convicted of a sexually violent offense is eligible for commitment and the conviction alone will definitely subject the defendant to a mandatory comprehensive evaluation for commitment nearing the end of his prison term."   Id. at 455 (emphasis added).

¶65 We disagree with the Hughes court's analysis, which focused on the "possibility of" or "eligibility for" commitment. Statistics discussed in one case before our court of appeals indicated that no more than 4.5 percent of people convicted of sexually violent offenses are even recommended for commitment proceedings under Chapter 980.   State v. Budd, 2007 WI App 245,

---

[14] Unlike the Supreme Court of Utah, which decided Trotter, 330 P.3d 1267, on May 20, 2014, the Supreme Court of Illinois did not have the benefit of Chaidez's February 20, 2013 assessment of Padilla when it decided Hughes on November 29, 2012, and denied rehearing on January 28, 2013.

¶16, 306 Wis. 2d 167, 742 N.W.2d 887.[15]  Properly considering the "possibility" of Chapter 980 commitment as part of the evaluation of whether commitment follows "automatically" from a conviction actually demonstrates how <u>unlikely</u> commitment is for the vast majority of people convicted of a sexually violent offense.

5.  Chapter 980 Commitment Is Not Enmeshed in the Criminal Process

¶66  Our evaluation of the nature of Chapter 980 commitment further counsels in favor of the conclusion that Chapter 980 commitment is not "intimately related to the criminal process." <u>Padilla</u>, 559 U.S. at 365.  To be sure, conviction of a sexually violent offense is a precondition to Chapter 980 commitment. But commitment is not an "integral part . . . of the penalty that may be imposed" on persons convicted of sexually violent offenses.  <u>Padilla</u>, 559 U.S. at 364.  Rather, it is a rehabilitative program that is unlikely to affect the vast majority of people convicted of qualifying offenses.  In the rare event that the state does pursue Chapter 980 commitment, the state must prove the person's "dangerousness" in addition to

---

[15] A recent DHS report with data through 2013 regarding Chapter 980 commitments includes statistics similar to those mentioned in <u>Budd</u>.  According to the report, the Department of Corrections refers only 3.3 percent of eligible inmates to DHS for possible Chapter 980 commitment.  <u>See</u> Deborah McCulloch, <u>Chapter980 Overview</u> 19 (2014), https://www.dhs.wisconsin.gov/sites/default/files/legacy/SandRidge/InformationalPapers/980Overview2014.pdf (indicating only 657 referrals for commitment among 19,689 eligible inmates screened by Department of Corrections).

the fact of the underlying conviction. Though future eligibility for Chapter 980 commitment may be a factor that a defendant considers when contemplating a plea, possible commitment requiring proof of dangerousness beyond a reasonable doubt is not part and parcel of a conviction or its resultant punishment.

6. No Special Vulnerability or Class Status Warrants Particularized Consideration for Persons Convicted of Sexually Violent Offenses

¶67 Unlike the "noncitizens" whose interests the Court considered in Padilla, people convicted of sexually violent offenses share no independent characteristic that provides a basis for developing an individualized exception for them. Noncitizens face deportation as a consequence of certain convictions because of their immigration status, a status that precedes any criminal proceedings against them. Deportation becomes "an integral part . . . of the penalty that may be imposed" for any conviction because of the noncitizen status. Padilla, 559 U.S. at 364. A certain immigration status thus makes noncitizens uniquely vulnerable to a punitive consequence of conviction above and beyond traditional punishments such as confinement.

¶68 Persons convicted of sexually violent offenses share no such common attribute that precedes conviction. Although some persons convicted of sexually violent offenses may have a history of serious mental illness that could serve as the basis for the "dangerousness" element in the Wis. Stat. § 980.01(6)

definition of "sexually violent persons," serious mental disorder is not a prerequisite for conviction of a sexually violent offense. The absence of a common precondition for eligibility for Chapter 980 commitment reinforces the conclusion that an exception would be inappropriate.

### IV. Conclusion

¶69 <u>Padilla</u> specifically brought advice about the unique consequence of deportation within the Sixth Amendment's guarantee of effective assistance of counsel. We decline to create a similar exception for Chapter 980 civil commitment. Chapter 980 commitment is a collateral consequence of a plea resulting in conviction of a sexually violent offense. <u>Myers</u>, 199 Wis. 2d at 394. The Sixth Amendment does not require defense counsel to inform a client about the possibility of civil commitment. To reach this conclusion, we rely on the many factors that differentiate the possibility of Chapter 980 commitment from the unique consequence of deportation.

¶70 We are mindful of defendants' reasonable desires to make informed choices about the consequences of any plea they might make. Certainly, the best practice for defense counsel is to discuss with the defendant any consequences of a plea that will have a meaningful impact on the defendant's decision to accept or reject a plea agreement. But the Sixth Amendment makes no guarantee of perfect advocacy, <u>Maryland v. Kulbicki</u>, 136 S. Ct. 2, 5 (2015) (per curiam) (citing <u>Yardborough v. Gentry</u>, 540 U.S. 1, 8 (2003) (per curiam)), and a best practice

does not rise to the level of implicating the constitutional interest set forth in Padilla.

¶71  Therefore, we conclude that LeMere's assertion that his counsel never informed him about the possibility of civil commitment under Chapter 980 does not form the basis for a claim of ineffective assistance of counsel.  Consequently, LeMere cannot withdraw his guilty plea.

*By the Court.*—The decision of the court of appeals is affirmed.

¶72  Rebecca G. Bradley, J., did not participate.

¶73 ANN WALSH BRADLEY, J. *(dissenting).* I agree that the criminal conduct described by the majority is heinous. If we were called upon as a court to condemn such conduct, I am confident that there would be immediate and unanimous condemnation.[1]

¶74 Our task in this review, however, is not to assess the defendant's conduct. Rather, we are called upon to analyze and apply a rule of law.

¶75 At issue is whether LeMere's counsel should have advised him that he is automatically eligible for involuntary, indefinite civil commitment after serving his criminal sentence. The precise issue is whether the Sixth Amendment requires defense counsel to inform a client about the possibility of civil commitment, under Wis. Stat. Chapter 980, when the client enters a plea to a qualifying sexually violent offense.

¶76 The majority concludes that "LeMere's assertion that his counsel never informed him about the possibility of civil commitment under Chapter 980 does not form the basis for a claim of ineffective assistance of counsel." Majority op., ¶71.

¶77 In reaching its conclusion, the majority fails to recognize that like the deportation consequences analyzed in

---

[1] LeMere pleaded guilty to first-degree sexual assault of a child under the age of 13, contrary to Wis. Stat. §§ 948.02(1)(e) and 939.50(3)(b). Majority op., ¶13. He was sentenced to thirty years of initial confinement, followed by fifteen years of extended supervision. Id., ¶17. A "sexually violent offense" that qualifies a defendant for Chapter 980 commitment includes any crime specified in Wis. Stat. 948.02(1). See Wis. Stat. § 980.01(6)(a).

<u>Padilla v. Kentucky</u>, 559 U.S. 356 (2010), a Chapter 980 commitment is a particularly severe and automatic penalty of a guilty plea that is closely connected to the criminal process. Its elimination of procedural protections results in indefinite and even permanent civil commitment. And like deportation, upon entry of a guilty plea there is automatic eligibility for this severe consequence.

¶78 Contrary to the majority, I conclude that the Sixth Amendment requires counsel to advise a client of the consequence of Chapter 980 commitment. I would reverse the court of appeals and remand to the circuit court for an evidentiary hearing.[2] Accordingly, I respectfully dissent.

I.

¶79 The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the assistance of counsel. This right has been interpreted to mean a defendant is entitled to the effective assistance of competent counsel. <u>See, e.g.</u>, <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). The right to effective assistance of counsel extends to the negotiation of a plea agreement. <u>Hill v. Lockhart</u>, 474 U.S. 52, 57 (1985). Effective assistance of counsel requires that the

---

[2] Pursuant to <u>State v. Machner</u>, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979), a defendant alleging ineffective assistance of counsel is entitled to an evidentiary hearing where trial counsel will testify. The circuit court determines if trial counsel provided ineffective assistance of counsel, and if so, whether it was prejudicial. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).

2

defendant be provided sufficient information upon which to make a knowing and intelligent plea. See id. at 56.

¶80 Prior to Padilla, courts "almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation." Chaidez v. U.S., 133 S. Ct. 1103, 1109 (2013). Defense counsel's only obligation was to advise clients of direct consequences of conviction.[3] Id.

¶81 Padilla, however, presented a paradigm shift. In Padilla, the Supreme Court determined that the Sixth Amendment requires counsel to provide advice to a criminal defendant about the risk of deportation arising from a guilty plea. 559 U.S. at 366.

¶82 Although Padilla did not eliminate the collateral/direct consequence test generally, it rejected the application, concluding that deportation's close connection to the criminal process makes it uniquely difficult to classify as either a direct or collateral consequence. Id. at 365-66; see also Chaidez, 133 S. Ct. at 1112. The Padilla court explained that deportation, although technically a civil proceeding, is a particularly severe penalty and that eligibility for deportation

---

[3] Typically, a collateral consequence is indirect, does not automatically flow from the conviction, and may depend on the subsequent conduct of a defendant. State v. Brown, 2004 WI App 179, ¶7, 276 Wis. 2d 559, 687 N.W.2d 543. In contrast, a direct consequence of a plea has a definite, immediate, and largely automatic effect on the range of a defendant's punishment. State v. Byrge, 2000 WI 101, ¶60, 237 Wis. 2d 197, 614 N.W.2d 477.

is nearly automatic for non-citizen offenders. 559 U.S. at 365-66.

¶83 Following <u>Padilla</u>'s analysis, we examine whether Chapter 980's close connection to the criminal process makes it uniquely difficult to apply a collateral-direct analysis. As in <u>Padilla</u>, the determination rests on an examination of the severity of the penalty and the nearly automatic eligibility for deportation.

## II.

¶84 The majority concludes that the consequence of a Chapter 980 commitment "does not rise to the level of implicating the constitutional interest set forth in <u>Padilla</u>." Majority op., ¶70. In its effort to distinguish involuntary civil commitment from deportation, the majority contends that "LeMere overstates, to a degree, the severity of Chapter 980 commitment." Majority op., ¶52.

¶85 Before embarking on a legal analysis of the severity of the consequence of Chapter 980 commitment, I pause to observe that this is not merely a matter of legal analysis, it is also one of common sense. The Sixth Amendment guarantees the right to effective assistance of counsel. To be effective, counsel must provide sufficient information to enable the defendant to make a knowing and intelligent plea.

¶86 When assessing whether to accept a plea agreement, would a defendant want to be informed that upon entering the plea, he faces the consequence of a possible lifetime civil commitment after serving his criminal sentence? Of course!

4

¶87 I agree with the sentiment expressed by Justice Gableman at oral argument that the severity of Chapter 980 commitment is essentially a given here. In transitioning the focus from the severity inquiry to the automatic eligibility part of the analysis, he commented:

Justice Gableman: "The part of this case that jumps out to me is not the severity of the possible consequence. **I don't think anyone could argue about the severe restrictions on the liberty of the person committed under Chapter 980.**

¶88 Nevertheless, the majority endeavors to persuade the reader that Chapter 980 consequences are really not all that severe. Relying on the procedural protections of Chapter 980 proceedings, the majority determines that Chapter 980 commitment is not as severe a penalty as deportation because the commitment is not necessarily permanent and does not always last for a lifetime. Majority op., ¶55.

### III.

¶89 The majority errs in its attempt to minimize the severity of a Chapter 980 commitment. Not only does it run afoul of common sense, it turns a blind eye to the parallel punitive trajectories of deportation and Chapter 980 commitment. In both, important procedural protections under the statute have been eliminated. Similarly, the consequences for both are severe, and may even last for a lifetime.

¶90 As we saw in Padilla, the elimination of procedural protections may heighten the severity of a civil proceeding to such an extent that counsel has an obligation under the Sixth Amendment to advise a client about the consequences of a guilty

5

plea. Just as the legislature eliminated important procedural protections from Chapter 980, important procedural protections that minimized the risk of deportation were eliminated from federal immigration law. See Padilla, 559 U.S. at 360-64.

¶91 In the past, federal immigration law "included a critically important procedural protection to minimize the risk of unjust deportation." Id. at 361. Under prior law, the sentencing judge in both state and federal prosecutions had the power to make a recommendation against deportation. Id. This procedure, known as judicial recommendation against deportation ("JRAD") was eliminated in 1990. Id. at 362-63. In 1996, the Attorney General's authority to grant discretionary relief from deportation was also eliminated. Id. at 363. The Padilla court explained, "[t]hese changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction." Id. at 364.

¶92 Similarly, over the years, "the legislature has steadily chipped away at those aspects of chapter 980 upon which we relied in determining that the statute was constitutional." In re Commitment of West, 2011 WI 83, ¶123, 336 Wis. 2d 578, 800 N.W.2d 929 (Bradley, J., dissenting). As previously explained, the elimination of important procedural protections from Chapter 980 has made it easier to commit an individual, the nature of the commitment is now more restrictive, and the duration of institutionalization is longer. Id. Accordingly, "chapter 980 increasingly resembles a punitive scheme." Id., ¶129.

6

¶93 It is now easier to commit an individual under Chapter 980 than in the past because a jury must conclude only that it is "likely" an individual will engage in acts of sexual violence. Wis. Stat. § 980.01(7) (2013-14). When Chapter 980 was first enacted, a jury was required to find beyond a reasonable doubt that it was "substantially probable that the person will engage in acts of sexual violence." Wis. Stat. § 980.01(7) (1993-94).

¶94 Additionally, the nature of the commitment has become more restrictive. When Chapter 980 was enacted, a commitment order could specify "institutional care in a secure mental health unit or facility . . . or other facility or supervised release." Wis. Stat. § 980.06(2)(b) (1993-94). The nature of the commitment is more restrictive today because the requirement that the Department of Health Services ("DHS") commit an individual in the "least restrictive manner" has been eliminated. Now, a commitment order "shall specify that the person be placed in institutional care," and the DHS "shall place a person committed under s. 980.06 at the secure mental health facility." Wis. Stat. §§ 980.06, 980.065(1m) (2013-14).

¶95 Today, the duration of institutionalization at the outset is also longer because reexamination need not occur until twelve months after initial confinement. Wis. Stat. § 980.07(1) (2013-14). When the statute was first enacted, DHS was required to reexamine committed persons "within 6 months after an initial commitment." Wis. Stat. § 980.07(1) (1993-94). The erosion of procedural protections has raised the stakes of a defendant's

7

guilty plea as the length of commitment and the number of individuals committed continue to increase.

¶96 Historical data on Chapter 980 indicates that the number of individuals committed under the statute has grown well beyond expectation. When Chapter 980 was enacted in 1994, it was "[a]nticipated at the time of adoption that the program would be small." Deborah McCulloch, Sand Ridge Secure Treatment Center: History of Chapter 980 at 14.[4] After implementation, however, "commitment rates significantly exceeded expectations." Id. at 15. By 2001, Sand Ridge Secure Treatment Center, the entity responsible for detaining individuals committed under Chapter 980, opened a $39 million facility with another $22 million expansion planned in 2009. Id. at 10.

¶97 Not only have commitment rates exceeded expectations, but statistical data indicates that individuals have been subject to indefinite and even lifetime commitment under Chapter 980. In 2004, ten years after Chapter 980 was enacted, the author of Sand Ridge's informational paper on recidivism acknowledged that "[t]o date comparatively few patients have been released...." David Thornton, Sand Ridge Secure Treatment Center, Wisconsin Dep't of Health Servs., Projecting the Amount of Sexual Recidivism Prevented by the Chapter 980 Program

---

[4] Available at: https://www.dhs.wisconsin.gov/sites/default/files/legacy/SandRidge/InformationalPapers/980Overview2014.pdf.

8

(Wisconsin's Civil Commitment for Sex Offenders) at 1.[5] A later study released in 2013 reported that 24 people were discharged "due to death." See State of Wisconsin Department of Health Services, Supervised Release Placements and Expenditures, Legislative Audit Bureau Report 13-12, 13 (Aug. 2013).[6] For the 24 people discharged due to death, Chapter 980 commitment was indeed permanent.

IV.

¶98 The majority attempts next to distinguish Chapter 980 commitment from deportation by arguing that it is not as "automatic" as deportation. Majority op., ¶¶58-65.

¶99 It contends that the consequence of deportation is automatic because "if a noncitizen has committed a removable offense . . ., his removal is practically inevitable." Id., ¶59 (citing Padilla 559 U.S. at 363-64). In contrast, the majority alleges that "a Chapter 980 petition is not an inevitable consequence of a conviction for a sexually violent offense." Majority op., ¶58.

¶100 Reaching its conclusion, the majority ignores this court's interpretation of Padilla discussed in an opinion issued just last term. The court in State v. Shata, 2015 WI 74, ¶101, 364 Wis. 2d 63, 868 N.W.2d 93, concluded that Padilla did not

---

[5] Available at: https://www.dhs.wisconsin.gov/sites/default/files/legacy/SandRidge/InformationalPapers/PROJECTINGTHEAMOUNTOFRECIDIVISMSAVEDBYTHE980PROGRAMSeptember2004Version.pdf.

[6] Available at: http://legis.wisconsin.gov/lab/reports/13-12full.pdf.

9

require Shata's attorney to tell him that his conviction would absolutely result in deportation. Instead, Shata interpreted Padilla to mean that counsel was required to advise the defendant that he was eligible for deportation.

¶101 Shata stated "[a]lthough a controlled substance conviction makes an alien 'deportable,' such a conviction will not necessarily result in deportation."[7] Id., ¶59 (internal citation omitted). "Thus, the Court meant that Padilla clearly was deportable under that immigration statute, not that he clearly would be deported." Id., ¶61 (citing Com. V. Escobar, 70 A.3d 838, 842 (Pa. 2013)).

¶102 Likewise, the majority disregards an essential part of Chaidez that further explains the holding in Padilla as it relates to the automatic nature of the consequence. Chaidez clarified that "[i]n Padilla v. Kentucky, this Court held that the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea." Chaidez, 133 S. Ct. at 1105 (internal citation omitted). In case there was any question about its holding in Padilla, the United States Supreme Court in Chaidez again emphasized that it was the risk of deportation that was the automatic consequence:

> While Chaidez's petition was pending, this Court
> decided Padilla. Our ruling vindicated Chaidez's view

---

[7] The term "alien" is used here because I quote directly from Shata. As the Sixth Circuit recognized in Flores v. U.S. Citizenship and Immigration Services, 718 F.3d 548, 551 n.1. (6th Circuit 2013), using the term "alien" to refer to other human beings may be "offensive and demeaning."

10

of the Sixth Amendment: We held that criminal defense attorneys must inform non-citizen clients of the risks of deportation arising from guilty pleas.

Chaidez, 133 S. Ct. at 1106.

¶103 Consequently, the correct focus for our analysis here is the risk of automatic eligibility for Chapter 980 commitment, rather than whether commitment itself is automatic. Eligibility for commitment was the focus employed in People v. Hughes, 983 N.E.2d 439 (Ill. 2012), which is particularly instructive here because it analyzed the very issues we now confront in Wisconsin.

¶104 In Hughes, the Illinois Supreme Court concluded "that defense counsel has a minimal duty to advise a defendant who pleads guilty to a triggering offense subject to the provision of the Sexually Violent Persons Commitment Act that he will be evaluated for and may risk involuntary commitment after completing his prison term." Id. at 457. As the Hughes court explained, "it is certain that a person convicted of a sexually violent offense is eligible for commitment and the conviction alone will definitely subject the defendant to a mandatory comprehensive evaluation for commitment nearing the end of his prison term." Id. at 455.

¶105 Ignoring our analysis in Shata and the holding in Chaidez, the majority casts away Hughes, explaining: "We disagree with the Hughes court's analysis, which focused on the 'possibility of' or 'eligibility for' commitment. Statistics discussed in one case before our court of appeals indicated that no more than 4.5 percent of people convicted of sexually violent

11

offenses are even recommended for commitment proceedings under Chapter 980." Majority op., ¶65 (citing State v. Budd, 2007 WI App 245, ¶16, 306 Wis. 2d 167, 742 N.W.2d 887).

¶106 However, the majority presents no supporting statistics with respect to deportation. In fact, as Shata explained in detail, the United States cannot and does not remove all persons who might be deportable. Due to prosecutorial discretion, limited resources and the government's removal priorities, there are avenues for non-citizens to avoid deportation. Shata, 364 Wis. 2d 63, ¶60 (citing Jeh Charles Johnson, Policies for the Apprehension, Detention and Removal of Undocumented Immigrants, at 2 (Nov. 20, 2014).[8]

¶107 Given reduced procedural protections, indefinite and even permanent commitment, as well as automatic eligibility for Chapter 980 commitment, I determine that Chapter 980 is analogous to deportation. It is a uniquely severe and automatic consequence of a criminal plea that is closely connected to the criminal process.

¶108 Accordingly, I conclude that under Padilla, the Sixth Amendment required counsel to advise LeMere that upon entering a plea, he was subject to Chapter 980 consequences. In assessing whether to accept the plea, LeMere should have been informed by his counsel that by entering the plea he could face an involuntary——and possible lifetime civil commitment——after completing his criminal sentence.

---

[8] Available at: http://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

12

V.

¶109 Although the majority concludes that the Sixth Amendment does not require counsel to advise a defendant regarding Chapter 980 commitment, it recommends that it would be the best practice for counsel to discuss any meaningful consequence of a plea. Majority op., ¶70.

¶110 Most criminal cases are now resolved by the plea process. Missouri v. Frye, 132 S. Ct. 1399, 1407 (2012). In Frye, the Unites States Supreme Court emphasized defense counsel's important duties and responsibilities in the plea process. Id. The Frye court explained that 94 percent of state convictions are resolved with a guilty plea and that "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." Id.

¶111 Hughes, 982 N.E.2d at 453, is consistent with a growing national movement toward providing defendants more

13

information about the collateral consequences of conviction.[9]
See generally, Symposium Issue: Beyond the Sentence: Collateral
Consequences of Conviction, 2015 Wis. L. Rev. 181-420 (2015).[10]
For example, the American Bar Association (ABA has assembled a
tool by which lawyers and defendants can easily search potential
collateral consequences by state and offense type.[11]

¶112 In contrast to the majority, I would follow Hughes and
conclude that under Padilla, the Sixth Amendment requires
counsel to advise a client regarding the consequence of a
Chapter 980 commitment. Accordingly, I respectfully dissent.

---

[9] According to the Hughes court, "in recent years several
scholars and commentators have brought to light potential
problems inherent in a rigid categorical system of
distinguishing between direct and collateral consequences,
especially in the Sixth Amendment context, given this new
landscape and the framework for analyzing claims of ineffective
assistance." People v. Hughes, 983 N.E.2d 439, 543-44 (Ill.
2012) (citing McGregor Smyth, From "Collateral" to "Integral":
The Seismic Evolution of Padilla v. Kentucky and Its Impact on
Penalties Beyond Deportation, 54 How. L.J. 795 (2011); Gabriel
J. Chin & Margaret Love, Status as Punishment: A Critical Guide
to Padilla v. Kentucky, 25 Crim. Just. 21, 27-28 (2010); Jenny
Roberts, Ignorance Is Effectively Bliss: Collateral
Consequences, Silence, and Misinformation in the Guilty-Plea
Process, 95 Iowa L. Rev. 119, 124-25 (2009); Jenny Roberts, The
Mythical Divide Between Collateral and Direct Consequences of
Criminal Convictions: Involuntary Commitment of "Sexually
Violent Predators", 93 Minn. L. Rev. 670, 673-77 (2008); Gabriel
J. Chin & Richard W. Holmes, Jr., Effective Assistance of
Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev.
697, 701-02, 712-13 (2002)).

[10] Available at: http://wisconsinlawreview.org/volume-2015-no-2/.

[11] See Am. Bar Ass'n, ABA Collateral Consequences,
http://www.abacollateralconsequences.org/.

¶113 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.